Nos. 14-2222/14-2219

IN THE
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

STATE OF NEW MEXICO
*Plaintiff/Appellee,*

v.

DEPARTMENT OF THE INTERIOR *et al.*,
*Defendants/Appellants,*

and

PUEBLO OF POJOAQUE, a federally-recognized Indian Tribe,
*Intervenor-Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
JAMES A. PARKER, DISTRICT JUDGE
CASE No.: **1:14-cv-695-JAP-SCY**
_____

**APPELLANT PUEBLO OF POJOAQUE'S
PETITION FOR PANEL AND EN BANC REHEARING**

CARRIE FRIAS
Chief General Counsel
Pueblo of Pojoaque Legal Department
58 Cities of Gold Road, Suite 5
Santa Fe, NM 87506
Telephone: (505) 455-2271
Email: cfrias@pojoaque.org

SCOTT CROWELL
Crowell Law Office-Tribal Advocacy
Group
1487 W. State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Email: scottcrowell@hotmail.com

DANIEL REY-BEAR
Rey-Bear McLaughlin, LLP
421 W Riverside Ave., Suite 1004
Spokane, WA 99201-0410
Telephone:  509-747-2502
Email: dan@rbmindianlaw.com

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.............................................................i

TABLE OF AUTHORITIES......................................................ii

I.    The April 21 Opinion Misapprehends and Conflicts with Chevron and Its Progeny by Improperly Ruling that IGRA "Expressly Forecloses" a Regulation on a "Precise Question" About Which IGRA is Completely Silent, and Disregarding the Agency's General Rulemaking Authority.........2

II.   The April 21 Opinion Conflicts with Supreme Court and Ninth and Eleventh Circuit Decisions on an Issue of Exceptional Importance by Subverting Rather than Fulfilling Congressional Intent for Statutory Implementation Absent an Unconstitutional Provision..........................................................10

CONCLUSION....................................................................16

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. Brock*,
 480 U.S. 678 (1987) .................................................................... *passim*

*Chevron U.S.A., Inc. v. N.R.D.C.*,
 467 U.S. 837 (1984) .................................................................... *passim*

*Contrerasa-Bocanegra v. Holder*,
 678 F.3d 811 (10th Cir. 2012) .............................................................5,8

*FDA v. Brown & Williamson Tobacco Corp.* ("*FDA*"),
 529 U.S. 120 (2000) ......................................................................4,8,9

*Harbert v. Healthcare Servs. Grp., Inc.*,
 391 F.3d 1140 (10th Cir. 2004) ..........................................................6,8

*K Mart Corp. v. Cartier, Inc.* ("*K Mart*"),
 486 U.S. 281 (1988) ..........................................................................3

*Mayo Foundation for Medical Education & Research v. United States* ("*Mayo*"),
 562 U.S. 44 (2011) ..................................................................... *passim*

*MCI Telecom. Corp. v. AT&T Co.* ("*MCI*"),
 512 U.S. 218 (1994) ......................................................................4,8,9

*Morton v. Mancari*,
 417 U.S. 535 (1974) ...........................................................................9

*Morton v. Ruiz*,
 415 U.S. 199 (1974) ...........................................................................8

*N.L.R.B. v. Pueblo of San Juan*,
 276 F.3d 1186 (10th Cir. 2002) ...........................................................15

ii

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007)...................................................................................9

*New Mexico v. Dep't of the Interior*,
   854 F.3d 1207 (10th Cir. 2017) ("April 21 Opinion")............................... *passim*

*Seminole Tribe of Florida v. Florida*,
   11 F.3d 1016, (11th Cir. 1994)("*Seminole-I"), aff'd in part*, 517 U.S. 44
   (1996)("*Seminole-II*") ...................................................................... *passim*

*UKB v. Oklahoma ex rel. Ross*,
   927 F.2d 1170 (10th Cir. 1991)...............................................................15

*United Keetoowah Band of Cherokee Indians v. U.S. Department of Housing and*
   *Urban Development* ("*UKB*"), 567 F.3d 1235 (10th Cir. 2009)........................6,8

*United States v. Booker*,
   543 U.S. 220 (2005)...............................................................................14

*United States v. Mead Corp.*,
   533 U.S. 281 (2001)...........................................................................3,4,5,8

*United States v. Spokane Tribe of Indians*,
   139 F.3d 1297 (9th Cir. 1998) ............................................................ *passim*

*United States v. Washington*,
   __ F.3d __, __, 2017 WL 2193387 ................................................................12

*Washington v. Wash. State Comm. Pass. Fishing Vessel Ass'n*, 443 U.S. 658
   (1979) ....................................................................................................9

**STATUTES**

25 C.F.R. § 291.1 ................................................................................7

25 C.F.R. § 291.1(b) ...........................................................................1,2

25 C.F.R. §§ 291.11(b)(3)-(4), (6)-(7) ...............................................15

25 C.F.R. Part 291 ("Part 291") ................................................. *passim*

25 U.S.C. § 2710(d)(3)(A) ..................................................................12

25 U.S.C. § 2710(d)(7)(B) ..............................................................1,2,7,8

25 U.S.C. § 2710(d)(7)(B)(vii) ...........................................................15

25 U.S.C. § 9 .................................................................................2,8,9,14

25 U.S.C. Section 13 ............................................................................9

25 U.S.C. Sections 2 ............................................................................9

Class III Gaming Procedures,63 Fed. Reg. at 3289 (Jan. 22, 1998) ...............7,9,14

Class III Gaming Procedures, 64 Fed. Reg. at 17 (April 12, 1999) ...............7,14,15

Indian Gaming Regulatory Act,
    25 U.S.C. ¶¶ 2701-19 ("IGRA") ............................................... *passim*

Request for Comments on Establishing Departmental Procedures to Authorize
    Class III Gaming on Indian Lands When a State Raises an Eleventh Amendment
    Defense to Suit under the Indian Gaming Regulatory Act, 61 Fed. Reg. at 21
    (May 10, 1996).........................................................................7,11,14

S. Rep. No. 100-46 ............................................................................13

**OTHER AUTHORITIES**

NIGC, Press Release: Live from Indian Country, The NIGC announces largest
    tribal revenue gain in 10 years (July 19, 2016), available at:
    https://www.nigc.gov/images/uploads/newsrelease/GGR_Press_Release_2016.p
    df (last visited June 20, 2017) ............................................................................11


**RULES**

Federal Rules of Appellate Procedure ("FRAP") 35.................................................1

FRAP 35(a).........................................................................................................3

FRAP 35(b)(1)...................................................................................................11

FRAP 40 ...............................................................................................................1

FRAP 40(a)(2)......................................................................................................3

Federal Rule of Evidence 201 ............................................................................11

Tenth Circuit Rules 35.1(A)................................................................................3

Tenth Circuit Rules 40.1(A)................................................................................3

Pursuant to Federal Rules of Appellate Procedure ("FRAP") 35 and 40, Intervenor Defendant-Appellant Pueblo of Pojoaque ("Pueblo") hereby petitions for panel and en banc rehearing for the opinion issued on April 21, 2017, *New Mexico v. Dep't of the Interior*, 854 F.3d 1207 (10th Cir. 2017) ("April 21 Opinion"). The April 21 Opinion held that the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701-19, forecloses procedures in 25 C.F.R. Part 291 ("Part 291") for class III Indian gaming when a "State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. [§] 2710(d)(7)(B)." 25 C.F.R. § 291.1(b). *New Mexico*, 854 F.3d at 1211, 1231. The April 21 Opinion warrants rehearing because it misapprehends and conflicts with decisions of the Supreme Court, the Tenth Circuit, and other circuits on significant issues of exceptional importance. First, the April 21 Opinion misapprehends and conflicts with *Chevron U.S.A., Inc. v. N.R.D.C.*, 467 U.S. 837 (1984), and its Supreme Court and Tenth Circuit progeny by ruling that Congress "has spoken in IGRA to the specific question that Part 291 is designed to address[.]" Second, the April 21 Opinion conflicts with *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987), *Seminole Tribe of Florida v. Florida* ("*Seminole-I*"), 11 F.3d 1016 (11th Cir. 1994), *aff'd in part*, 517 U.S. 44 (1996) ("*Seminole-II*"), and *United States v. Spokane Tribe of Indians*, 139 F.3d 1297 (9th Cir. 1998), by failing to ensure that IGRA will function

consistently with congressional intent without its unconstitutional provision for lawsuits by Indian tribes against States.

**I.**    **The April 21 Opinion Misapprehends and Conflicts with *Chevron* and Its Progeny by Improperly Ruling that IGRA "Expressly Forecloses" a Regulation on a "Precise Question" About Which IGRA is Completely Silent, and Disregarding the Agency's General Rulemaking Authority.**

The April 21 Opinion correctly recognizes that the first step in determining whether agency rules are valid is whether Congress "unambiguously" or "directly" has addressed the "precise question at issue" or "the specific problem the regulation is designed to address or answer." *New Mexico*, 854 F.3d at 1222. However, no provision of IGRA addresses the conduct of class III Indian gaming when a "State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. [§] 2710(d)(7)(B)[,]" 25 C.F.R. § 291.1(b), and Congress has authorized "such regulations as . . . fit for carrying into effect various provisions of any act relating to Indian affairs," 25 U.S.C. § 9. Notwithstanding this, the April 21 Opinion concludes that "[t]he absence of such an express delegation of authority is conspicuous" and that "IGRA expressly forecloses the procedures . . . in Part 291" because Congress "has spoken in IGRA to the specific question that Part 291 is designed to address[.]" *New Mexico*, 854 F.3d at 1223, 1226. That ruling warrants both panel and en banc rehearing because it misapprehends and contravenes numerous Supreme Court and Tenth Circuit decisions on the significant and exceptionally important first step for determining whether statutes authorize or

2

preclude agency regulations. *See* FRAP 35(a), 40(a)(2); Tenth Circuit Rules 35.1(A), 40.1(A).

The April 21 Opinion appropriately recognizes that the first step of *Chevron* analysis requires framing "a question that correlates to the specific problem the regulation is designed to address or answer." *New Mexico*, 854 F.3d at 1222. This is required because *Chevron* itself held that "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Additional decisions by the Supreme Court and the Tenth Circuit confirm this point and elaborate on it and its importance.

For example, *K Mart Corp. v. Cartier, Inc.* ("*K Mart*"), 486 U.S. 281 (1988), recognized that the first step of *Chevron* analysis concerns whether "the statute is silent or ambiguous with respect to the specific issue addressed by the regulation," *id.* at 291. Similarly, *Mayo Foundation for Medical Education & Research v. United States* ("*Mayo*"), 562 U.S. 44 (2011), recognized that "*Chevron* step one" concerns whether the governing statute "attends to the precise question" addressed in the disputed regulation. *Id.* at 52 (citation omitted). Moreover, *Chevron* and its Supreme Court progeny recognize that Congress can engage in "'implicit'" delegation of authority based on an "agency's generally conferred authority[,]" which includes filling "in a space in the enacted law . . . about which 'Congress did not actually have an intent' as to a particular result." *United States v. Mead Corp.*,

533 U.S. 281, 229 (2001) (quoting *Chevron*, 467 U.S. at 844, 845); *see also Mayo*, 562 U.S. at 57 (same, and quoting other cases). Indeed, "such 'express congressional authorizations to engage in . . . rulemaking'" constitute "'a very good indicator of delegation meriting *Chevron* treatment[,]'" and the promulgation of a rule after notice-and-comment procedures constitutes "a 'significant' sign that a rule merits *Chevron* deference." *Mayo*, 562 U.S. at 57-58 (quoting *Mead*, 533 U.S. at 229, 230-31).

In such circumstances, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority" to resolve a "particular" statutory gap so long as the agency's resolution is reasonable under *Chevron* step two. *Mead Corp.*, 533 U.S. at 229 (citing *Chevron*, 467 U.S. at 845-46); *see also Chevron*, 467 U.S. at 843-44. In contrast, statutory authorization to merely "modify" requirements does not allow "radical or fundamental" changes by an agency. *MCI Telecom. Corp. v. AT&T Co.* ("*MCI*"), 512 U.S. 218, 225, 229 (1994). Also, it is not likely that Congress would delegate industry-wide regulation to agency discretion via a subtle authorization. *Id.* at 231; *see also FDA v. Brown & Williamson Tobacco Corp.* ("*FDA*"), 529 U.S. 120, 133 (2000). Finally, the Supreme Court repeatedly has expressly recognized "'the importance of maintaining a uniform approach to judicial review of administrative action.'" *Mayo*, 562 U.S. at 55 (citation omitted).

4

*Chevron*, *Mead*, and *Mayo* illustrate proper application of *Chevron* step one. *Chevron* held that a Clean Air Act mandate for permitting "new or modified major stationary sources" of air pollution did not preclude a rule with a plantwide or "bubble" definition of "stationary source" under which a plant may install or modify equipment without a permit unless the alteration increases total emissions from the plant, because "Congress did not actually have an intent regarding the applicability of the bubble concept to the permit program[.]" *Chevron*, 467 U.S. at 839, 845. In contrast, in *Mead*, Congress provided general authorization for tariff classification rulings but such agency letters could not qualify for *Chevron* deference because they were not promulgated in the exercise of general agency rulemaking authority. *Mead*, 533 U.S. at 221, 229-31. Finally, *Mayo* applied *Chevron* to hold that a statutory exemption from Social Security taxes for "student[s]" did not preclude a regulation which excluded medical residents from that exemption, which was issued after notice and comment pursuant to a general authorization to prescribe rules under the Internal Revenue Code. *Mayo*, 562 U.S. at 47, 53, 57.

Various Tenth Circuit cases also apply *Chevron* step one. For example, in *Contrerasa-Bocanegra v. Holder*, 678 F.3d 811 (10th Cir. 2012), the Tenth Circuit en banc applied *Chevron*'s standard of whether "'Congress had an intention on the precise question at issue'" to hold that a statutory right to file one motion to reopen

immigration removal proceedings precluded a regulation banning post-departure motions to reopen because the statute on its face left no room for the post-departure bar. *Id.* at 816-17 (quoting *Chevron*, 467 U.S. at 843 n.9). Similarly, *United Keetoowah Band of Cherokee Indians v. U.S. Department of Housing and Urban Development* ("*UKB*"), 567 F.3d 1235 (10th Cir. 2009), held under *Chevron* step one that a statute which "explicitly and unambiguously" limits federal housing funding based on tribal need precludes a regulation on the "precise question at issue" which adds a requirement that tribes exercise court jurisdiction. *Id.* at 1239-41. In contrast, *Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140 (10th Cir. 2004), held that there was not "sufficiently clear" contrary congressional intent to invalidate a regulation under the first step of *Chevron* on the "precise question" of the meaning of "worksite" for jointly-employed employees because Congress did not expressly define the term "worksite" as "part of the balance that was struck between the interests of employers and the interests of employees," *id.* at 1147-49.

Contrary to the above governing cases, the April 21 Opinion only paid lip service to the *Chevron* step-one standard, then disregarded it in substance, with a perverse result on a substantial legal issue. Rather than frame the "precise," "particular," or "specific" question per the regulation at issue, the April 21 Opinion materially broadened the question to eliminate the required precision and set up a straw man alternative that was obviously precluded. This misconstrued and

contravened *Chevron* and its progeny.

Here, the regulation itself states the precise question at issue as follows:

> The regulations in this part establish procedures that the Secretary will use to promulgate rules for the conduct of Class III Indian gaming when:
> (a) A State and an Indian tribe are unable to voluntarily agree to a compact and:
> (b) The State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. [§] 2710(d)(7)(B) [, i.e., IGRA § 11).

25 C.F.R. § 291.1. The latter element is critical to defining the "precise" question because Part 291 was expressly promulgated solely to implement IGRA's compacting provisions in response to the ruling in *Seminole-II*, 517 U.S. 44 (1996), that the Eleventh Amendment precludes Congress from authorizing tribes to sue States under IGRA.[1]

In contrast, the April 21 Opinion omits the critical qualifier of Section 291.1(b) and disregards the sole purpose why Part 291 was promulgated. Instead, the April 21 Opinion broadly redefines "the specific question that Part 291 is designed to address" as "when is the Secretary authorized to issue Class III gaming procedures for a tribe that has been unable to enter into a compact with a state?" *New Mexico*, 854 F.3d at 1223. Such a rule, if real, would allow secretarial

---

[1] Request for Comments on Establishing Departmental Procedures to Authorize Class III Gaming on Indian Lands When a State Raises an Eleventh Amendment Defense to Suit Under the Indian Gaming Regulatory Act, 61 Fed. Reg. 21,394, 21,394-95 (May 10, 1996) (advance notice); Class III Gaming Procedures, 63 Fed. Reg. 3289, 3289-90 (Jan. 22, 1998) (proposed rule); Class III Gaming Procedures, 64 Fed. Reg. 17,535, 17,536 (April 12, 1999) (final rule).

procedures whenever an Indian tribe is unable to enter into a gaming compact at any time, for any reason, or for no reason at all. That would indeed constitute an "end run" around clear statutory language and "rewrite IGRA." *Id.* at 1225. But that is not at all the "precise question" that Part 291 actually addresses.

The April 21 Opinion so misconstrues and contravenes *Chevron* step one that, if its analysis were applied, it would change the outcome of *Chevron* and other cases. *See Chevron*, 467 U.S. at 839, 845 (upholding bubble rule for stationary sources of pollution); *Mayo*, 562 U.S. at 47, 53, 57 (upholding regulatory exception to statutory tax exemption); *Harbert*, 391 F.3d at 1147-49 (concerning "worksite" clarification). Because IGRA is completely silent regarding how to address gaming compacting when a "State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. [§] 2710(d)(7)(B)," this case is not like *MCI*, *FDA*, *UKB*, or *Contrerasa-Bocanegra*, where regulations contravened or attempted radical changes to a statute.

Finally, the April 21 Opinion contravenes *Chevron*, *Mead*, and *Mayo* by failing to recognize that the expressly broad delegation of general rulemaking authority in 25 U.S.C. Section 9 implicitly authorizes filling the gap in IGRA for the precise subject of Part 291. *Compare New Mexico*, 854 F.3d at 1226 *with Chevron*, 467 U.S. at 843-44; *Mead Corp.*, 533 U.S. at 229; *Mayo*, 562 U.S. at 57. Indeed, *Chevron* quoted *Morton v. Ruiz*, 415 U.S. 199 (1974), for the key point

8

that "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires . . . the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Chevron*, 467 U.S. at 843 (quoting *Ruiz*, 415 U.S. at 231). The very next sentence of *Ruiz* recognized that "[i]n the area of Indian affairs, the Executive has long been empowered to promulgate rules and policies, and the power has been given explicitly to the Secretary and his delegates[,]" citing 25 U.S.C. Sections 2, 9, and 13. *Ruiz*, 415 U.S. at 231 (footnotes omitted).

The age and broad nature of  25 U.S.C. Section 9 do not preclude it from authorizing Part 291 to implement IGRA after *Seminole-II*. *See id.* at 231 & n.25 (noting 1834 enactment); *Washington v. Wash. State Comm. Pass. Fishing Vessel Ass'n*, 443 U.S. 658, 691 (1979) (noting federal Indian fishing regulation under "general Indian powers" of 25 U.S.C. §§ 2 and 9); 63 Fed. Reg. at 3290-91, 3294 & n.1 (relying on Section 9)). That statute authorizes Part 291 because there is no basis to rule that IGRA partly repealed that prior statute by express contradiction or as required to give IGRA any meaning at all. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 663, 664 n.8 (2007); *Morton v. Mancari*, 417 U.S. 535, 549, 551 (1974). Also, Section 9 is anything but a "subtle" authorization and Part 291 addresses a "precise" question, so that authorization for this rule cannot contravene *MCI* or *FDA*. The contrary ruling here therefore readily

9

warrants both panel and en banc rehearing.

## II. The April 21 Opinion Conflicts with Supreme Court and Ninth and Eleventh Circuit Decisions on an Issue of Exceptional Importance by Subverting Rather than Fulfilling Congressional Intent for Statutory Implementation Absent an Unconstitutional Provision.

In *Alaska Airlines*, the Supreme Court reaffirmed that an unconstitutional statutory provision is severed when Congress would have enacted the remainder of the statute in its absence. *Alaska Airlines*, 480 U.S. at 684-85. Thus, for IGRA's unconstitutional provision, the Eleventh Circuit in *Seminole-I* found as follows:

> [w]e are left with the question as to what procedure is left for an Indian tribe faced with a state that not only will not negotiate in good faith, but also will not consent to suit. The answer, gleaned from the statute, is simple. . . . If the state pleads an Eleventh Amendment defense, the suit is dismissed, and the tribe . . . then may notify the Secretary of the Interior . . . . The Secretary then may prescribe regulations governing class III gaming on the tribe's lands. This solution conforms with IGRA and serves to achieve Congress' goals, as delineated in §§ 2701-02.

*Seminole-I*, 11 F.3d at 1029; *see Seminole-II*, 517 U.S. at 76 n.18 (expressing no opinion on that ruling below). Similarly, in applying *Alaska Airlines* to address how IGRA may function without its provision for tribal suits against States for bad-faith negotiations, the Ninth Circuit in *Spokane Tribe* concluded the following:

> It is quite clear from the structure of the statute that the tribe's right to sue the state is a key part of a carefully crafted scheme balancing the interests of the tribes and the states. It therefore seems highly unlikely that Congress would have passed . . . [IGRA], leaving the tribes essentially powerless.

*Spokane Tribe*, 139 F.3d at 1299-1300. The April 21 Opinion warrants rehearing

because it conflicts with these three decisions on issues of exceptional importance.

First, severance of a "key part" of IGRA so that the remainder functions independently and consistently with Congress' basic objective, including authorization for a regulation to address the resulting statutory gap, readily presents issues of exceptional importance that warrant rehearing under FRAP 35(b)(1). In addition to the case law conflicts discussed here, the National Indian Gaming Commission has reported that gaming revenue for 238 Indian tribes in 2015 totaled $29.9 billion and directly provides resources for social services, public works, education, housing, health care, emergency services, and public safety.[2] Also, even though Part 291 concerns a "precise" question, it addresses an issue of "importance . . . to the tribes, the States, and the general public . . . ." 61 Fed. Reg. at 21,395.

Substantively, the April 21 Opinion properly recognizes "'the need to provide some incentive for States to negotiate with tribes in good faith[.]'" 854 F.3d at 1227 (quoting S. Rep. No. 100-446, at 13-14 (1988)). Also, the "[e]qual bargaining" in IGRA's "delicate balancing" cannot be achieved and would be "fundamentally altered" where, "absent an agreement, one side will nevertheless

---

[2]NIGC, Press Release: The NIGC announces largest tribal revenue gain in 10 years (July 19, 2016), available at https://www.nigc.gov/images/uploads/news release/GGR_Press_Release_2016.pdf (last visited June 20, 2017). The Pueblo requests that the Court take judicial notice of this public statement by a federal agency per Federal Rule of Evidence 201.

11

obtain its fundamental goals[.]" *Id*. This is critical because "'if the remaining provisions cannot operate according to the congressional design . . . , it almost necessarily follows that Congress would not have enacted them . . . .'" *Id*. at 1233 n.10 (citation omitted). Yet notwithstanding that, the April 21 Opinion fails to ensure that IGRA will function consistently with Congressional intent without its unconstitutional provision, as required by *Alaska Airlines*.

Contrary to the April 21 Opinion, the mere possibilities that a State "may" either waive or not assert its immunity or be sued by the United States, *id*. at 1234-25, do not eliminate the need or authorization for a Secretarial remedy for tribes absent IGRA's unconstitutional provision. The mere possibility—as opposed to the prior existence—of an immunity waiver per se cannot provide any incentive for a State to fulfill IGRA's mandate that states negotiate compacts in good faith. *See* 25 U.S.C. § 2710(d)(3)(A). That is the situation following the April 21 Opinion. In turn, it "will be no easy thing for . . . tribes to persuade the United States to bring comparable suits against . . . States." *United States v. Washington*, __ F.3d __, __, 2017 WL 2193387, *4 (W. Fletcher and Gould, JJ., conc. in denial of rehearing en banc). Identifying unlikely hypothetical remedies cannot excuse the error of leaving tribes without a definite recourse against recalcitrant states as Congress intended.

All this supports following *Seminole-I* and *Spokane Tribe* to conclude that a

federal remedy through Secretarial procedures is necessary to preserve Congress's balancing of state and tribal interests in IGRA and to secure the benefits of IGRA to tribes. As the Ninth Circuit recognized in *Spokane Tribe*, Congress in IGRA "struck a finely-tuned balance between the interests of the states and the tribes" and "[m]ost likely it would not have been enacted if that balance had tipped conclusively in favor of the states . . . ." *Spokane Tribe*, 139 F.3d at 1301; *see id.* at 1299-1301 (reviewing IGRA and its legislative history). Also, given *Seminole-II*, the Eleventh Circuit's suggestion in *Seminole-I* regarding what became Part 291 "is a lot closer to Congress's intent than mechanically enforcing IGRA against tribes . . . when states refuse to negotiate." *Id.* at 1302; *see Seminole-I*, 11 F.3d at 1019-20, 1029; S. Rep. No. 100-446, at 2-3, 13-14, 33.

The April 21 Opinion improperly subverts rather than upholds the basic Congressional objective and intent in IGRA applied in *Seminole-I* and *Spokane Tribe*. Congress intended IGRA to reaffirm and support sovereign tribal rights. 25 U.S.C. § 2702(1); S. Rep. 100-446, at 5. Congress there also intended "that the compact requirement for Class III not be used as justification by a state for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes." S. Rep. 100-446, at 13. To address that concern, IGRA granted Indian tribes "a right to sue a state if compact negotiations are not concluded, . . . balancing the interests

13

and rights of tribes to engage in gaming interests against the interests of States in regulating such gaming." *Id.* at 14 (concerning 25 U.S.C. §2710(d)(7)). When that right to sue states was held unconstitutional, Part 291 was properly promulgated under IGRA and an express, general congressional authorization for Indian affairs rulemaking to ensure the protection of tribal sovereignty as intended by Congress.

To be sure, neither *Spokane Tribe* nor *Seminole-I* addressed Part 291 itself, since Part 291 did not exist at the time of those decisions. However, Part 291 was promulgated in part based on *Seminole-I*, and later *Spokane Tribe* as well, with a thorough analysis of Secretarial authority to prescribe those procedures, including two rounds of notice and comment rulemaking. 61 Fed. Reg. at 21,395; 63 Fed. Reg. at 3290-91; 64 Fed. Reg. at 17,537. The authorization for Part 291 under IGRA and 25 U.S.C. Section 9 enables IGRA to function largely as Congress intended without its unconstitutional provision, and thereby helps to resolve severance analysis under *Alaska Airlines*. *See United States v. Booker*, 543 U.S. 220, 258-59 (2005) (retain statutory provisions that are constitutionally valid, function independently, and consistent with basic statutory objectives). Moreover, as noted above, the promulgation of a rule after notice-and-comment procedures constitutes "a 'significant' sign that a rule merits *Chevron* deference." *Mayo*, 562 U.S. at 57-58 (quoting *Mead*, 533 U.S. at 229, 230-31).

The April 21 Opinion misreads IGRA and Part 291 to avoid *Seminole-I* and

*Spokane Tribe* and invalidate Part 291. As *Seminole-I* recognized, IGRA itself provides for Secretarial Procedures to finally resolve compacting disputes after states are sued for failure to negotiate in good faith. *Seminole-I*, 11 F.3d at 1029 (citing 25 U.S.C. § 2710(d)(7)(B)(vii)). That provision—like Part 291—provides that any gaming by a tribe thereunder must be consistent with IGRA and the relevant provisions of State law. 25 U.S.C. § 2710(d)(7)(B)(vii); *see* 25 C.F.R. §§ 291.11(b)(3)-(4), (6)-(7). Thus, the April 21 Opinion wrongly finds that Part 291 "fundamentally alters the bargaining power of the parties and undoes Congress's delicate balancing of the competing state and tribal interests at stake . . . ." *New Mexico*, 854 F.3d at 1227-28. To the contrary, Part 291 preserves that balance, and the April 21 Opinion's invalidation of Part 291 fundamentally alters that balance, by empowering states to negotiate with impunity. In turn, the April 21 Opinion improperly objects to Part 291 for not including a determination of bad-faith state negotiation, *id.* at 1226, because there can be no such determination once a state successfully asserts immunity, *see* 64 Fed. Reg. at 17,537. Finally, the April 21 Opinion failed to apply the "well-established canon of Indian law . . . that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002) (en banc) (citation omitted); *see UKB v. Oklahoma ex rel. Ross*, 927 F.2d 1170, 1179 (10th Cir. 1991) (applying same to

15

IGRA). Instead of following that rule, the April 21 Opinion wrongly reversed it to close a specific statutory gap identified by the Supreme Court, rather than recognize it to affirm a valid regulation.

## Conclusion

The April 21 Opinion warrants both panel and en banc rehearing because its invalidation of the Part 291 regulations misapprehends and conflicts with both *Chevron* and *Alaska Airlines* and their respective progeny in the Tenth Circuit and the Ninth and Eleventh Circuits. The April 21 Opinion countenances the very result that Congress intended to avoid.

Dated: June 20, 2017

Respectfully submitted,

*s/ Scott Crowell*
Scott Crowell
Crowell Law Office-
Tribal Advocacy Group
1487 W State Route 89A, Suite 8
Sedona, AZ 86336
Telephone: 425-802-5369
Email: scottcrowell@clotag.net

Carrie Frias, Chief General Counsel
Pueblo of Pojoaque Legal Department
Pueblo of Pojoaque
58 Cities of Gold Road, Suite 5
Santa Fe, NM 87506
Telephone: 505-455-2271
Email: cfrias@pojoaque.org

Daniel Rey-Bear
Rey-Bear McLaughlin, LLP
421 W Riverside Ave., Suite 1004
Spokane, WA 99201-0410
Telephone: 509-747-2502
Email:  dan@rbmindianlaw.com


*Attorneys for Intervenor-Defendant-Appellant*
Pueblo of Pojoaque

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing was served on the Court and opposing counsel via the CM/ECF system on June 20, 2017 and that to my knowledge, all counsel of the record in this case are registered to receive service through that system.

Date: June 20, 2017

*s/ Scott Crowell*
SCOTT CROWELL

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief contains 3,899 words and complies with the type-volume limitation of Fed. R. App. P. 35 excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify, that this brief has been prepared in a proportionally spaced typeface using Word Mac 2011 in a 14-point New Times Roman font, and that it complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6).

Date: June 20, 2017

*s/ Scott Crowell*
SCOTT CROWELL

## CERTIFICATE OF DIGITAL SUBMISSION

1. I certify that with respect to the foregoing that all required privacy redactions have been made per 10th Cir. R. 25.5.

2. I certify that, within two business days, I will cause to be delivered to the Clerk of the Court six copies in paper form of this Petition for Panel and En Banc Rehearing Brief, which will be exact replicas of the electronically filed version.

3. I certify that, prior to filing, the digital submissions have been scanned for viruses with the most recent version of a commercial scanning program, Bitdefender Antivirus version 5.2.2.7, last updated June 20, 2017 and according to the program is free of viruses.

Date: June 20, 2017

*s/ Scott Crowell*
SCOTT CROWELL

FILED
United States Court of Appeals
Tenth Circuit

April 21, 2017

Elisabeth A. Shumaker
Clerk of Court

## PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

|  |  |
|---|---|
| STATE OF NEW MEXICO,<br><br>     Plaintiff-Appellee,<br><br>v.<br><br>DEPARTMENT OF THE INTERIOR;<br>RYAN ZINKE, in his official capacity<br>as Secretary of the Interior,[*]<br><br>     Defendants-Appellants,<br><br>and<br><br>PUEBLO OF POJOAQUE, a<br>federally-recognized Indian Tribe,<br><br>     Intervenor Defendant-Appellant. | Nos. 14-2219 & 14-2222 |

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:14-CV-00695-JAP-SCY)**

J. David Gunter II, U.S. Department of Justice, Environment & Natural Resources Div., Washington, D.C. (John C. Cruden, Assistant Attorney General, Steven Miskinis and Yosef M. Negose, U.S. Department of Justice, Environment & Natural Resources Div., Washington, D.C., with him on the briefs), for Defendants-Appellants.

---

[*]      Pursuant to Fed. R. App. P. 43(c)(2), Ryan Zinke, who is the current Secretary of the Interior, is automatically substituted for Sally Jewell as Defendant in this case.

Steffani A. Cochran, Pueblo of Pojoaque Legal Department, Santa Fe, New Mexico, and Scott Crowell, Crowell Law Offices, Sedona, Arizona, for Intervenor Defendant-Appellant.

Eric D. Miller, Perkins Coie, Seattle, Washington (Jennifer A. MacLean, Perkins Coie, Washington, D.C., and Jeremiah L. Ritchie, Office of the Governor, Santa Fe, New Mexico, with him on the briefs), for Plaintiff-Appellee.

---

Before **HOLMES**, **McHUGH**, and **MORITZ**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

The State of New Mexico ("the State" or "New Mexico") brought suit against the Department of the Interior ("DOI") to challenge its authority to promulgate the regulations found at 25 C.F.R. § 291 *et seq.* ("Part 291"). The challenged regulations concern the process under which Indian tribes and states negotiate compacts to allow gaming on Indian lands. Congress established in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, that states have a duty to negotiate in good faith with tribes regarding compacts and that tribes could enforce this duty by bringing suit in federal court. As the Supreme Court would later decide, however, Congress lacked the authority to make states subject to suit by Indian tribes in federal court. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). However, the Court left intact the bulk of IGRA, and Congress has not amended it in the intervening years.

More specifically, IGRA provides that when a tribe believes a state has failed to negotiate in good faith, the tribe may sue in federal court to, *inter alia*, obtain an order enjoining a state to negotiate a gaming compact and potentially subjecting the state to court-ordered mediation or the issuance of gaming procedures by the Secretary of the Interior ("the Secretary") without the state's consent. However, the Supreme Court, in *Seminole Tribe*, made clear that a state can invoke sovereign immunity in response to such a suit, thus effectively side-stepping the process that IGRA contemplates. *See id.* at 47 ("We hold that notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause [U.S. Const. art. I, § 8, cl. 3] does not grant Congress that power, and therefore [25 U.S.C.] § 2710(d)(7) cannot grant jurisdiction over a State that does not consent to be sued."). In response to *Seminole Tribe*, DOI promulgated Part 291 to allow the Secretary to prescribe gaming regulations for a tribe following the dismissal of a tribe's suit against a state on sovereign-immunity grounds.

As relevant here, the Part 291 process was implicated after the Pueblo of Pojoaque tribe ("the Pojoaque" or "the Tribe") sued New Mexico under IGRA and the State asserted sovereign immunity. Following the dismissal of the case on sovereign-immunity grounds, the Pojoaque asked the Secretary to prescribe gaming procedures pursuant to Part 291. Before the Secretary did so, New

Mexico filed the present suit, seeking a declaration that the Part 291 regulations are not a valid exercise of the Secretary's authority.  The Pojoaque intervened.

The district court granted New Mexico's motion for summary judgment and denied that of DOI, holding that the Part 291 regulations are invalid and barring the Secretary from taking any further action on the Pojoaque's request for the issuance of gaming procedures under them.  DOI and the Pojoaque now appeal from this order; they challenge the State's standing, the ripeness of the dispute, and the district court's holding that Part 291 is an invalid exercise of the Secretary's authority.  Exercising our jurisdiction under 28 U.S.C. § 1291, we conclude that the dispute is justiciable and **affirm** the district court's judgment.

# I

## A

In 1987, the Supreme Court held that states lack regulatory authority over gaming activities on Indian land except where Congress has expressly provided for such authority.  *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987).  Following this ruling, Congress enacted IGRA, 25 U.S.C. § 2701 *et seq.*, which gives states a role in the regulation of Indian gaming.  The act divides gaming into three classes.  *See* 25 U.S.C. § 2703.  The present case concerns Class III gaming, which includes the most lucrative forms of gaming.  25 U.S.C. § 2703(8); *see Seminole Tribe*, 517 U.S. at 48 ("Class III gaming . . . includes such things as slot machines, casino games, banking card games, dog racing, and

4

lotteries.").  Under IGRA, Class III gaming activities "shall be lawful on Indian lands only if such activities are conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State [where the gaming is located] . . . that is in effect."  25 U.S.C. § 2710(d)(1)(C).  An Indian tribe desiring such a compact "shall request the State . . . to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.  Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact."  25 U.S.C. § 2710(d)(3)(A).

This case concerns how the process unfolds in the event that these negotiations do not commence following a tribe's request or are unsuccessful. The statute provides that if no agreement is reached within 180 days of a tribe's request for negotiation, the tribe may initiate a "cause of action . . . arising from the failure of [the] State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact . . . or to conduct such negotiations in good faith."  25 U.S.C. § 2710(d)(7)(A)(i) *and* (B)(i).  It further provides that federal district courts shall have jurisdiction over such a suit.  25 U.S.C. § 2710(d)(7)(A)(i).  If the district court in which a suit is filed finds that the state has failed to negotiate in good faith, "the court shall order the State and the Indian Tribe to conclude such a compact within a 60-day period."  25 U.S.C. § 2710(d)(7)(B)(iii).  If the parties fail to reach an agreement within sixty days,

the statute outlines a process under which the tribe and the state each would

submit a proposed compact to a mediator, and the mediator would select one.  25

U.S.C. § 2710(d)(7)(B)(iv).  At that point, the state may consent to the selected

compact or it may decline to do so.  If the state does not consent, the mediator is

required to notify the Secretary, who "shall prescribe, in consultation with the

Indian tribe, procedures . . . consistent with the proposed compact selected by the

mediator . . . under which Class III gaming may be conducted."  25 U.S.C.

§ 2710(d)(7)(B)(vii)(I) to (II).

The Supreme Court's ruling in *Seminole Tribe* complicated the process

outlined above.  In that case, the Court held, in the context of the Indian

Commerce Clause, that "the Eleventh Amendment prevents congressional

authorization of suits by private parties against unconsenting States," and

therefore a case against a state concerning whether it has failed to negotiate with

a tribe in good faith cannot proceed unless the state has statutorily or otherwise

waived its sovereign immunity or fails to assert its immunity as a defense.[1]  517

U.S. at 72.  However, states still retain the obligation to negotiate in good faith

under 25 U.S.C. § 2710(d)(3)(A).

Following *Seminole Tribe*, DOI issued the Part 291 regulations to provide

an alternative administrative remedial scheme that applies when a state asserts

---

[1]       *See, e.g.*, *Rincon Band of Lusieno Mission Indians v. Schwarzenegger*, 602
F.3d 1019, 1026 (9th Cir. 2010); *Northern Arapaho v. Wyoming*, 389 F.3d 1308, 1313
(10th Cir. 2004).

sovereign immunity in a § 2710(d)(7) suit.  25 C.F.R. § 291.1.  Under these

regulations, when a district court dismisses a suit following a state's assertion of

sovereign immunity, the tribe "may ask the Secretary to issue Class III gaming

procedures" by submitting proposed procedures.[2]  25 C.F.R. §§ 291.3, 291.4.

Upon receipt of such a request, the Secretary must "notify the Indian tribe in

writing whether the Indian tribe meets the eligibility requirements in § 291.3."  25

C.F.R. § 291.6.  If the tribe meets those requirements, which are not directly at

issue here, then the Secretary is required to submit the tribe's proposed

procedures to the state, which then has sixty days to comment on the proposal.  25

C.F.R. § 291.7(a), (b).  The Secretary "will also invite the [state] to submit an

alternative proposal."  25 C.F.R. § 291.7.

   The nature of the remainder of the process depends on whether the state

submits its own proposal.  In cases in which the state declines to do so by the end

of the sixty-day comment period, the regulations set forth a process under which

the Secretary ultimately approves the tribe's proposal, and accordingly issues

"Secretarial Procedures" allowing gaming on the tribe's land, or disapproves the

tribe's proposal for one of seven reasons listed in Section 291.8(a).  *See* 25 C.F.R.

§ 291.8.  On the other hand, if the state submits an alternative proposal within the

sixty-day period, the Secretary must appoint a mediator to "convene a process to

---

   [2]    Note that the regulations do not require any finding that the state failed to
negotiate in good faith, only that the case was dismissed after the state asserted sovereign
immunity.

resolve differences between the two proposals."  25 C.F.R. § 291.9(b).  The

mediator is charged with "select[ing] from the two proposals the one that best

comports with the terms of IGRA and any other applicable Federal law.  The

mediator must submit the proposal selected to the Indian tribe, the State, and the

Secretary."  25 C.F.R. § 291.10(b).  Following the mediator's decision, the

Secretary must either approve the chosen proposal, and issue Secretarial

Procedures, or disapprove it for one of the seven reasons listed in Section

291.11(b) (which mirror those found in Section 291.8(a)).  25 C.F.R. § 291.11(a)

*and* (b).  If the proposal is not approved at this stage, then the Secretary "must

prescribe appropriate [Secretarial Procedures] within 60 days under which Class

III gaming may take place that comport with the mediator's selected proposal as

much as possible, the provisions of IGRA, and the relevant provisions of the laws

of the State."  25 C.F.R. § 291.11(c).

## B

The genesis of this case is the Pojoaque's attempt to negotiate a Class III

gaming compact with New Mexico.  More than 180 days after the Pojoaque

submitted a request to negotiate with the State, the Tribe brought suit under IGRA

in federal district court, seeking a declaration that New Mexico had failed to

negotiate in good faith.  New Mexico asserted sovereign immunity, and the court

dismissed the case on that basis.  The Pojoaque then asked the Secretary to

initiate the Part 291 process and issue Class III gaming procedures.  The

8

Secretary subsequently informed New Mexico that DOI had determined, pursuant to 25 C.F.R. § 291.6, that the Pojoaque had met the eligibility requirements of the Part 291 regulations; the Secretary thus invited the State to comment on the Pojoaque's proposal or submit an alternative proposal within sixty days.

Before the end of the sixty-day period, New Mexico filed this case against the Secretary, seeking a declaration that the Part 291 regulations are invalid and an order enjoining DOI from developing Secretarial Procedures for the Pojoaque pursuant to the regulations. The Tribe filed a motion to intervene; the district court granted it, but only on a permissive basis, pursuant to Federal Rule of Civil Procedure 24(b). More specifically, the court allowed the Tribe "to intervene as a defendant . . . and join in the other Defendants' motion for summary judgment on the purely legal question of [the regulations'] validity." Aplee.'s Supp. App. at 71–72. New Mexico then filed a motion for a preliminary injunction, which the district court denied. Following the denial of its motion, the State submitted comments and an alternative proposal to the Secretary. *See* Aplee.'s Br. at 14.[3]

The State, and the Secretary joined by the Pojoaque, subsequently moved for summary judgment. The district court granted New Mexico's motion and denied that of the Secretary, which also effectively denied the Tribe relief. The

---

[3]     In a letter to the State, the Secretary opined that New Mexico could participate in the Part 291 process "under protest" and without waiving "its rights to challenge a decision that might result in issuance of gaming procedures for the Pueblo." Aplee.'s Supp. App. at 2.

court ruled that (1) New Mexico had standing to bring suit, (2) its challenge was ripe for judicial review, (3) the Part 291 regulations were not a valid exercise of the Secretary's power under IGRA, and (4) *Seminole Tribe* did not require the court to hold any additional IGRA provisions invalid, an issue that the Pojoaque had raised in its memorandum in support of the Secretary's motion.  The court thus barred the Secretary and DOI "from taking any further action to enforce 25 C.F.R. § 291 *et seq*."  Aplts.' App. at 66.  The Secretary and the Pojoaque now appeal.

## II

On appeal, DOI and the Pojoaque contend that (1) New Mexico lacks standing to challenge the Part 291 regulations, (2) the State's claim is not ripe, and (3) the regulations are a valid exercise of the Secretary's authority under IGRA.  The Pojoaque further asserts that if we were to conclude that Part 291 is invalid, we should undertake a severability analysis and, in light of the Supreme Court's decision in *Seminole Tribe*, strike down additional portions of IGRA because IGRA's jurisdiction-granting clause is not severable.  Below, we first determine that New Mexico has standing and its claim is ripe; thus, we may properly exercise jurisdiction.  Next, we conclude that the Part 291 regulations are not a valid exercise of the Secretary's authority; specifically, they are invalid because they are foreclosed by IGRA's unambiguous text.  Lastly, we determine that the severability issue raised by the Pojoaque is properly before us but that the

jurisdiction-granting clause is severable.  We thus affirm the district court's grant

of New Mexico's motion for summary judgment and its denial of the Secretary's

motion for summary judgment.

## A

DOI first contends that New Mexico lacks standing.[4]  "The constitutional

requirements for standing are (1) an injury in fact, (2) a causal connection

between the injury and the challenged act, and (3) a likelihood that the injury will

be redressed by a favorable decision."  *Roe No. 2 v. Ogden*, 253 F.3d 1225,

1228–29 (10th Cir. 2001) (citing *Vt. Agency of Nat. Res. v. United States ex. rel.*

*Stevens*, 529 U.S. 765, 771 (2000)).  Before us, DOI challenges New Mexico's

standing only on the basis of the first requirement, arguing that the State has

suffered no injury in fact.  The district court rejected this argument, finding that

the State had demonstrated an injury sufficient for standing purposes.  We review

this finding de novo, *see Roe No. 2*, 253 F.3d at 1228, and conclude

that New Mexico has demonstrated an injury in fact on two independent bases:

first, it has suffered a procedural injury in that the Part 291 regulations have

stripped New Mexico of certain procedural protections or benefits conferred by

IGRA; and, second, it has been subjected by DOI to a harmful forced choice

regarding whether to participate in the allegedly unlawful Part 291 process.  Our

---

[4]    For convenience, we refer throughout this opinion to the positions advanced in DOI's briefs as DOI's arguments; however, the Pojoaque join DOI's briefs in full.  The Tribe also separately advances severability arguments addressed *infra* in Part II.D.

confidence in our holding on both fronts, moreover, is bolstered by our

recognition that, as a state, New Mexico is entitled to special solicitude on the

issue of standing.

**1**

New Mexico has standing because it has suffered a procedural injury.  The

Supreme Court has recognized that, for standing purposes, a party's injury may be

a procedural one "so long as the procedures in question are designed to protect

some threatened concrete interest of [the party] that is the ultimate basis of [its]

standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992); *see also*

*Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (recognizing that

standing may be grounded in "a procedural right [that a person has been

accorded] to protect *his concrete interests*" (quoting *Lujan*, 504 U.S. at 572 n.7));

*WildEarth Guardians v. EPA*, 759 F.3d 1196, 1205 (10th Cir. 2014) (noting that,

to demonstrate an injury in fact, a plaintiff need only show that the procedures at

issue "are designed to protect some threatened concrete interest of [the person]

that is the ultimate basis of standing" (alteration in original) (quoting *S. Utah*

*Wilderness All. v. Office of Surface Mining Reclamation & Enf't*, 620 F.3d 1227,

1234 (10th Cir. 2010))).  To establish standing in such circumstances, a plaintiff

"need show only that compliance with the procedural requirements *could* have

better protected its concrete interests," *WildEarth Guardians*, 759 F.3d at 1205,

and thus that the procedural violation created a "risk of real harm," *Spokeo, Inc.*

*v. Robins*, --- U.S. ----, 136 S. Ct. 1540, 1549 (2016).  Further, the Court observed in *Lujan* that "'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Lujan*, 504 U.S. at 572 n.7 ("Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.").

We have frequently found standing based on a procedural injury in cases in which environmental groups have alleged that an agency failed to follow the required procedures in taking an action that negatively impacted members' concrete interest in protecting and enjoying the affected land.  *See, e.g.*, *WildEarth Guardians*, 759 F.3d at 1205 (concluding that the failure of the Environmental Protection Agency ("EPA") to consult with another federal regulatory agency before issuing a federal implementation plan was a procedural injury that supported standing because adherence to procedural requirements could have better protected plaintiff members' concrete interest in enjoyment of land); *S. Utah Wilderness All.*, 620 F.3d at 1235 (concluding that plaintiff had standing to challenge Office of Surface Mining Reclamation and Enforcement's

13

failure to prepare a recommendation to DOI regarding a private party's mining plan because this procedural injury affected plaintiff's concrete interest in protecting the area where mining was to take place); *see also Summers*, 555 U.S. at 497 (suggesting that plaintiffs would have had standing based on procedural injury had they been denied the opportunity to file comments on a Forest Service plan that would have impinged on their concrete interest in observing nature in the specific area affected).

In addition to environmental cases, courts have also relied on the procedural-injury doctrine in other contexts in which statutorily mandated procedures were designed to protect plaintiffs' interests. *See, e.g.*, *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 712–13 (6th Cir. 2015) (concluding that "Juggalos," fans of the Insane Clown Posse musical group, had standing where they alleged that the National Gang Intelligence Center had violated the Administrative Procedure Act ("APA") in issuing a report on gang activity without adhering to required procedures, thus causing them to be discussed in a report, which in turn caused concrete harm to their reputational interests); *Beeman v. TDI Managed Care Servs., Inc.*, 449 F.3d 1035, 1039–40 (9th Cir. 2006) (holding that plaintiff pharmacies "ma[d]e out a procedural injury: the failure on the part of the [Pharmacy Benefit Managers] to follow the statutory procedures requiring [that] they conduct studies and provide them to third

14

parties," a failure that threatened the pharmacies' interest in the outcome of future third-party payor decisions).

In this vein, New Mexico has demonstrated a procedural injury sufficient for Article III standing in the present case. Specifically, New Mexico asserts that the Part 291 regulations deprive it of a procedural right that IGRA accords states—specifically, the right to a judicial finding that it has failed to negotiate in good faith, *before* a mediator or the Secretary are authorized to become involved in defining the terms under which Class III gaming can be conducted within its borders. *See* 25 U.S.C. § 2710(d)(7)(B)(iii)–(vii) (outlining the process under which a tribe may ask the Secretary to prescribe gaming procedures following a judicial finding that a state has failed to negotiate in good faith). Indeed, absent a judicial finding that a state has not negotiated in good faith, a tribe cannot secure Class III gaming under the regime of IGRA without directly engaging with a state and hammering out the terms of a compact. *See Texas v. United States*, 497 F.3d 491, 494 (5th Cir. 2007) ("If the court finds the state negotiated in good faith, the tribe's proposal [for Class III gaming] fails"); *id.* at 508 ("IGRA allows Class III gaming to be imposed by the Secretary following exhaustion of the judicial good-faith/mediation process . . . ."). This procedural right is designed to protect the State's interest in helping to shape without federal interference the terms under which the Pojoaque may conduct Class III gaming within its territory. Even DOI recognizes that the State's interest in such gaming

15

terms is not insubstantial or speculative.  *See* Aplt. DOI's Opening Br. at 22

("[T]he State's concrete interest lies in the terms on which a tribe may (or may

not) conduct gaming—for example, the types of gaming allowed or whether the

tribe will rely on the State for particular services.").  It is clear to us that the loss

of this procedural right—which the Part 291 regulations would allegedly

effect—at least threatens this concrete interest by fundamentally changing the

process under which a state and a tribe negotiate a compact and, more

specifically, altering the circumstances under which the tribe may bypass the state

and seek relief from DOI.  *See Texas*, 497 F.3d at 508 ("Under the Secretarial

procedures, however, it matters not that a state undertook good-faith negotiations

with the tribe: The Secretary may prescribe Class III gaming irrespective of a

state's good faith.").  This substantial risk to this interest establishes the requisite

injury in fact for standing purposes.  *See Spokeo*, 136 S. Ct. at 1549 (noting that a

procedural violation may amount to an injury in fact where it creates a "risk of

real harm").  We therefore conclude that New Mexico has demonstrated that it has

suffered a procedural injury as a result of the Part 291 regulations.

　　　The validity of this conclusion is underscored by the D.C. Circuit's analysis

in *Delaware Dep't of Nat. Res. & Envtl. Control v. Fed. Energy Regulatory

Comm'n*, 558 F.3d 575 (D.C. Cir. 2009), which discusses the Fifth Circuit's

reasoning in *Texas v. United States*, a case in which Texas challenged the Part

291 regulations on the same basis that New Mexico has here and the court held

16

that Texas had standing to do so.[5]  Although the Fifth Circuit's opinion did not

explicitly characterize the injury that Texas had suffered as a procedural one, in

later interpreting its injury-in-fact ruling, the D.C. Circuit commented that

> the key to the court's conclusion that Texas had suffered an
> injury-in-fact was that Texas had been deprived of an alleged
> statutory procedural protection—a court finding on whether
> Texas had negotiated in bad faith—that bore on the likelihood of
> an ultimate concrete injury, *i.e.*, the Secretary's approval of an
> Indian gaming proposal.

*Delaware Dep't of Nat. Res. & Envtl. Control*, 558 F.3d at 579.  Thus, the D.C.

Circuit reasoned, the injury that prompted the *Texas* court to find standing was

the procedural injury to Texas of being deprived of a bad-faith finding.  This

characterization of *Texas* aligns perfectly with our conclusion that New Mexico

has suffered a procedural injury sufficient to support standing in the present case

by being deprived of a judicial determination regarding its alleged failure to

negotiate in good faith.

---

[5]      In *Texas*, a panel of the Fifth Circuit issued three separate opinions.  First,
Chief Judge Jones, writing in part for herself and in part for the court, held that Texas had
standing and that the dispute was ripe for review.  497 F.3d at 495–99.  Next, she argued
that the Part 291 regulations were invalid under *Chevron* step one, though she also stated
that, even reaching step two, the regulations were impermissible.  *Id.* at 499–511; *see
generally Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984).
Judge King joined the chief judge's opinion as to the justiciability issues, but would have
found the statute ambiguous in light of *Seminole Tribe*, though she concurred that the
regulations still should be invalidated but under *Chevron* step two.  497 F.3d at 511–12.
Judge Dennis dissented, arguing that the statute was ambiguous and that the regulations
should be upheld under *Chevron* step two.  *Id.* at 513–26.  We find most persuasive the
opinion of Chief Judge Jones.  In particular, we depart, *infra*, from the position of the
concurrence and dissent that IGRA is ambiguous.

17

Here, New Mexico has a procedural right to a judicial determination of bad faith followed by the statutory mediation process. That process is designed to protect a state's economic and other interests in the regulation of Class III gaming on tribal land, and the circumvention of the statutory process threatens to harm those interests by allowing the issuance of gaming procedures without the state's consent. This deprivation of a procedural right designed to protect a concrete interest is sufficient to establish standing.

**2**

In addition to the procedural injury discussed above, we alternatively conclude that New Mexico has suffered an injury because the Part 291 regulations have imposed a forced choice on it: At the end of the process that the regulations contemplate, the Secretary will *necessarily* issue procedures that will govern the Tribe's Class III gaming activities in New Mexico; if New Mexico wants to have any input into the content of those procedures, it is *forced* (i.e., compelled) to participate in the Part 291 process, even though it deems that process unlawful, thereby suffering a cognizable injury for standing purposes. Put another way, the Part 291 regulations injure New Mexico by forcing it to choose between participating in a process it considers unlawful and forgoing any benefit from that allegedly unlawful process—*viz.*, the benefit of being able to offer input, presumably beneficial to its interests, relating to the content of those procedures. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 582 (1985)

("[A]ppellees clearly have standing to contest EPA's issuance of follow-on registrations pursuant to what they contend is an unconstitutional statutory provision. They allege an injury from EPA's unlawful conduct—the injury of being forced to choose between relinquishing any right to compensation from a follow-on registrant or engaging in an unconstitutional [arbitral] adjudication."); *Texas*, 497 F.3d at 497 ("Texas's only alternative to participating in this allegedly invalid process is to forfeit its sole opportunity to comment upon Kickapoo gaming regulations, a forced choice that is itself sufficient to support standing.").

In concluding that Texas had been subjected to a forced-choice injury, Chief Judge Jones stressed that "[t]he alleged injury is not hypothetical because the Secretarial Procedures have already been applied to Texas." 497 F.3d at 497. In this regard, the judge observed: "The Kickapoo Tribe submitted a Class III gaming application to the [DOI], the Secretary notified Texas and the tribe that the application met the relevant eligibility requirements, and the Secretary invited Texas to comment on the proposal and submit an alternative proposal." *Id.* As noted *supra*, New Mexico has confronted essentially the same scenario, and we concur with Chief Judge Jones's reasoning in holding that this renders New Mexico's alleged injury (resulting from a forced choice) concrete and non-conjectural; it is an independently sufficient injury for standing purposes.

The soundness of this conclusion, moreover, is underscored by the Court's observation in *Lujan* regarding the nature of the alleged injury for standing

19

purposes that is effected where the plaintiff is the target of the government's action: "When the suit is one challenging the legality of government action or inaction . . . [and] the plaintiff is himself an object of the action (or forgone action) at issue . . . , there is ordinarily little question that the action or inaction has caused [the plaintiff] injury . . . ." *Lujan*, 504 U.S. at 561–62; *see Texas*, 497 F.3d at 498 (quoting the same passage of *Lujan* to support a like proposition). There is no doubt that New Mexico is the object of the government's forced-choice action; under *Lujan*'s reasoning, that means ordinarily New Mexico will have suffered an injury from that action.  And, based on our analysis *supra*, we believe that is so, and this injury under the circumstances here is sufficient for standing purposes.

### 3

In reaching these standing conclusions, we are mindful of the Supreme Court's statement in *Massachusetts v. EPA* that states are "entitled to special solicitude in our standing analysis."  549 U.S. 497, 520 (2007).  We have previously recognized that *Massachusetts* requires that a state be afforded some special consideration when analyzing its standing to bring suit, despite "the lack of guidance on how lower courts are to apply the special solicitude doctrine to standing questions."  *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1238 (10th Cir. 2012); *see also New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009) (noting that consideration of

special solicitude supported conclusion that state had standing); *Utah ex rel. Div. of Forestry, Fire & State Lands v. United States*, 528 F.3d 712, 721 (10th Cir. 2008) (same); *cf. Texas v. United States*, 809 F.3d 134, 162 (5th Cir. 2015) ("[O]ur determination that Texas has standing is based in part on the 'special solicitude' we afford it under *Massachusetts v. EPA* . . . ."), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Thus the Supreme Court's direction that we give states special solicitude in analyzing standing provides further support for each basis establishing New Mexico's standing.

In sum, we conclude that the State has demonstrated injury in fact, and we therefore reject DOI's challenge to its standing to bring the present case.

## B

We turn next to DOI's argument that the present case is not ripe for review because the Secretary has not yet prescribed any gaming procedures for the Pojoaque and may never do so. The district court found that New Mexico's claim was ripe. Reviewing this determination de novo, *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1191 (10th Cir. 2008), we agree.

"The ripeness doctrine aims to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Rural Water Dist. No. 2 v. City of Glenpool*, 698 F.3d 1270, 1275 (10th Cir. 2012). "In evaluating ripeness the 'central focus is on whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed

21

may not occur at all.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097–98 (10th Cir. 2006) (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995)).  Specifically, in considering the ripeness of challenges to federal agency action, we have considered four factors: "(1) whether the issues involved are purely legal, (2) whether the agency's action is final, (3) whether the action has or will have an immediate impact on the petitioner, and (4) whether resolution of the issue will assist the agency in effective enforcement and administration."  *Qwest Commc'ns Int'l, Inc. v. FCC*, 398 F.3d 1222, 1231–32 (10th Cir. 2005); *accord Mobil Expl. & Producing U.S., Inc. v. Dep't of Interior*, 180 F.3d 1192, 1197 (10th Cir. 1999).  Applying these factors, we agree with the district court that this case is ripe for review.

Beginning with the first factor, the parties agree—as do we—that the issues in this appeal are purely legal.  New Mexico challenges the Secretary's authority to promulgate and enforce the Part 291 regulations as a matter of law; thus, the resolution of the merits of the parties' dispute depends entirely on legal matters.  Turning to the second factor, we think it clear that the relevant agency action—DOI's promulgation of the Part 291 regulations—is final.  As the Fifth Circuit explained in *Texas*, "[t]he challenged [regulations] are a 'final agency action,' as they are final rules that were promulgated through a formal, notice- and-comment rulemaking process after announcement in the Federal Register." 497 F.3d at 499 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 150–51 (1967),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)); *see also Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967) ("[T]here can be no question that this regulation—promulgated in a formal manner after notice and evaluation of submitted comments—is a 'final agency action' under [the APA].");
*Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 46 (D.D.C. 2011) (noting, as to agency's argument that its actions could not be final until it granted or denied any permit it had subjected to the challenged process, that the agency had "misse[d] the point of the plaintiff's claim: that the process itself [was] unlawful, and not simply any decisions that may result from the application of that process"). Because the regulations that New Mexico challenges here have been promulgated through a formal rule-making process, we conclude that the relevant agency action is final.[6]

Moving on to the third factor, our next consideration centers on whether the agency's action—promulgating the Part 291 regulations—has had or will have an immediate impact on New Mexico. The State argues that the regulations have had

---

[6] In discussing the second factor of the ripeness inquiry, the parties—in line with the district court's analysis—focus on DOI's determination that the Pojoaque are eligible to participate in the Part 291 process. This determination is undoubtedly a final agency action, see 25 C.F.R. § 291.6(b) ("The Secretary's eligibility determination is final for the Department."), and DOI does not argue otherwise. But DOI maintains that the State's claim will not be ripe until the agency actually promulgates gaming procedures for the Pojoaque. This focus on the act of issuing procedures, however, is misplaced. New Mexico challenges the regulations themselves, and, accordingly, their *promulgation* constitutes the relevant agency action for ripeness purposes.

a direct impact: relying on the Fifth Circuit's analysis in *Texas*, New Mexico

contends that it has been "forced to choose one of two undesirable options:

participate in an allegedly invalid process that eliminates a procedural safeguard

promised by Congress, or eschew the process with the hope of invalidating it in

the future, which risks the approval of gaming procedures in which the state had

no input."  Aplee.'s Br. at 35 (quoting *Texas*, 497 F.3d at 499).  We agree.

Indeed, in light of our standing reasoning *supra*, and our resulting conclusion that

New Mexico has suffered a cognizable injury because of the forced choice

imposed on it by DOI, we have no difficulty determining that the impact of the

agency's regulations has already been felt by New Mexico.  *Cf. Initiative &*

*Referendum Inst.*, 450 F.3d at 1097 ("Standing and ripeness are 'closely related in

that each focuses on whether the harm asserted has matured sufficiently to

warrant judicial intervention.'" (quoting *Skull Valley Band of Goshute Indians v.*

*Nielson*, 376 F.3d 1223, 1234 (10th Cir. 2004))).  We are thus satisfied that New

Mexico has already been impacted by the Part 291 regulations, and therefore the

third ripeness factor also weighs in the State's favor.

Lastly, as for the fourth factor in the ripeness analysis, a decision from our

court on whether DOI may subject states to the Part 291 process will patently

assist the agency's administration of the tribal-state compacting process.  DOI

argues that a ruling would not have such an effect because it has yet to prescribe

gaming regulations for any tribe under Part 291.  But, again here, the critical

24

point is that New Mexico challenges DOI's authority to engage in the Part 291 process at all, not just to prescribe gaming procedures at its end.  Moreover, "[n]othing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution" of the validity of DOI's regulatory scheme.  *Union Carbide*, 473 U.S. at 582.  We thus conclude that this final factor also supports the conclusion that the dispute before us is ripe.

All four factors in the ripeness analysis weigh in favor of the case being ripe for adjudication.  Furthermore, other courts have similarly found that plaintiffs have demonstrated ripeness in cases in which they have been subjected to an administrative process, even where that process is still ongoing.  *See, e.g.*, *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 410–11 (8th Cir. 1985) ("[The plaintiff] challenges not the state's ultimate substantive decision but its authority to even conduct the contemplated [administrative] proceeding.  It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress."); *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 46 (finding that plaintiffs' claim was ripe where they challenged an EPA permitting process, despite fact that they had yet to be granted or denied any permit through that process).  In sum, New Mexico's challenge to the Part 291 regulations is ripe: its challenge does not invite our involvement in an abstract disagreement, but rather seeks a resolution of a

25

concrete dispute concerning final regulations issued by DOI that have already had an impact on the State.

C

Having established that New Mexico has standing to challenge the Part 291 regulations and that the dispute is ripe, we now ask whether the regulations are a valid exercise of DOI's authority under IGRA.  Reviewing the district court's conclusion de novo, *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008), we conclude that they are not.

In determining whether an agency's regulations are valid under a particular statute, as the Supreme Court's decision in *Chevron* instructs, we begin with the question of whether the statute unambiguously addresses the "precise question at issue."  *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984); *accord United Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. & Urban Dev.*, 567 F.3d 1235, 1239–40 (10th Cir. 2009); *see also Keller Tank Servs. II, Inc. v. Comm'r*, 848 F.3d 1251, 1269 (10th Cir. 2017) (noting that "[t]he *Chevron*-deference analysis proceeds in two steps," and explicating them both).  "If Congress has spoken *directly* to the issue, that is the end of the matter; the court, as well as the agency, must give effect to Congress's unambiguously expressed intent."  *Keetoowah Band*, 567 F.3d at 1240 (emphasis added). However, if the statute is silent or ambiguous as to the precise question at issue, a court must determine whether to afford the agency's interpretation *Chevron*

26

deference.  *Id.*  Such deference is appropriate if "'Congress delegated authority to the agency generally to make rules carrying the force of law' and the agency's interpretation of the statute was issued pursuant to that authority."  *Carpio v. Holder*, 592 F.3d 1091, 1096–97 (10th Cir. 2010) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)).  If these conditions are satisfied, then we defer to the agency's interpretation of the statute as long as it is not "arbitrary, capricious, [n]or manifestly contrary to the statute," *id.* at 1096 (alteration in original) (quoting *Herrera–Castillo v. Holder*, 573 F.3d 1004, 1007 (10th Cir. 2009)).

We thus begin our analysis by defining the precise question and then considering whether Congress unambiguously addressed that question.

## 1

We begin by determining whether IGRA unambiguously answers the precise question at issue here.  As other courts have recognized, "the resolution of this threshold inquiry will be at least influenced, if not determined, by how broadly we frame the 'precise question.'"  *Bank of Am., N.A. v. FDIC*, 244 F.3d 1309, 1316 (11th Cir. 2001); *see also Cent. States Motor Freight Bureau, Inc. v. Interstate Commerce Comm'n*, 924 F.2d 1099, 1112 (D.C. Cir. 1991) (Silberman, J., dissenting) ("I think it very important to be said, that if the [court were to] read the 'precise question at issue' too broadly the Supreme Court's decision in

27

*Chevron* can be undermined and appropriate deference to an agency interpretation would thereby be avoided.").

Here, the parties dispute how to frame the precise question addressed by the Part 291 regulations.  On one hand, New Mexico urges us to adopt the framing used by the district court—*viz.*, the precise question at issue is "whether IGRA has spoken to the situations where the Secretary may adopt regulations allowing a Tribe to conduct gaming activities without a compact with the State." Aplts.' App. at 60.  Under this framing of the question, the district court found that IGRA was unambiguous because the statute makes clear that the Secretary may only adopt such regulatory procedures after a federal court finds that the State has failed to negotiate in good faith and has ordered mediation between the parties.  On the other hand, DOI argues that the question before us is whether the Secretary may prescribe gaming procedures for a tribe when a state asserts its sovereign immunity from a tribe's suit, resulting in the suit's dismissal.  As explained below, we ultimately settle on a framing closer to the one the district court adopted.

Although *Chevron* itself does not offer much discussion on how to frame the precise question at issue in a given case, the Supreme Court later described the step-one inquiry as whether "the statute is silent or ambiguous with respect to the specific issue *addressed by the regulation*."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (emphasis added); *see Chevron*, 467 U.S. at 837

(suggesting that the step-one analysis involves asking "if the statute is silent or ambiguous with respect to the specific issue").  Thus, in *K Mart*, the Court indicated that, at *Chevron* step one, courts should frame a question that correlates to the specific problem the regulation is designed to address or answer.  And, later cases from the Court reflect adherence to this approach.  *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52 (2011) (evaluating a regulation characterizing medical residents as employees, rather than as students exempt from the Federal Insurance Contributions Act ("FICA"), and holding that the statute did "not define the term 'student,' and does not *otherwise* attend to the precise question whether medical residents are subject to FICA" (emphasis added)); *see also Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1148 (10th Cir. 2004) (finding, where regulation defined term "worksite," that the precise question at issue was "whether Congress expressed a clear intent with respect to the meaning of 'worksite' *for an employee who is jointly employed*" (emphasis added)).

However, we recognize that, in directly speaking to the specific regulatory question or problem, Congress need not "explicitly delineate everything an agency cannot do."  *Contreras-Bocanegra v. Holder*, 678 F.3d 811, 818 (10th Cir. 2012) (en banc) ("*Chevron* does not require Congress to explicitly delineate everything an agency cannot do before we may conclude that Congress has directly spoken to the issue.  Such a rule would 'create an "ambiguity" in almost

all statutes, necessitating deference to nearly all agency determinations.'" (quoting *Prestol Espinal v. Attorney Gen.*, 653 F.3d 213, 220 (3d Cir. 2011))); *see also Prestol Espinal*, 653 F.3d at 221 ("[A] 'statute's silence on a given issue does not confer gap-filling power on an agency unless the question is in fact a gap—an ambiguity tied up with the provisions of the statute.'" (quoting *Lin-Zheng v. Attorney Gen.*, 557 F.3d 147, 156 (3d Cir. 2009) (en banc))).

The Part 291 regulations prescribe the conditions under which the Secretary can issue Class III gaming procedures for a tribe that is unable to enter into a compact with a state.  More specifically, they address the situation where a tribe's compact negotiations with a state under IGRA have failed and the state has invoked sovereign immunity to the tribe's IGRA lawsuit.  *See* 25 C.F.R. § 291.1. They expressly present the question of "[w]hen may an Indian tribe ask the Secretary to issue Class III gaming procedures?"  *See* 25 C.F.R. § 291.3.  And they answer that a tribe may ask the Secretary to issue procedures when (1) it has submitted a written request to negotiate to the state; (2) the negotiations have been unsuccessful after 180 days from the receipt of the request; (3) the tribe sued the state, alleging bad faith; (4) the state raised the Eleventh Amendment as a defense; and (5) the court dismissed the case on that basis.  *Id.*  Though Congress did not envision the holding of *Seminole Tribe*, we conclude that it has spoken in IGRA to the specific question that Part 291 is designed to address: that is, when is

the Secretary authorized to issue Class III gaming procedures for a tribe that has been unable to enter into a compact with a state?

### 2

Thus, we begin our *Chevron* inquiry by asking when (i.e., under what circumstances) can the Secretary issue Class III gaming procedures for a tribe that has been unable to enter into a compact with a state—for example, as most relevant here, because the state has invoked sovereign immunity to the tribe's IGRA lawsuit.  As the Supreme Court's opinion in *Seminole Tribe* makes clear, at the time it drafted IGRA, Congress did not contemplate that it lacked the authority to make states subject to suit under 25 U.S.C. § 2710(d)(7).  *See Seminole Tribe*, 517 U.S. at 76 ("Nor are we free to rewrite the statutory scheme in order to approximate what we think Congress might have wanted *had it known that § 2710(d)(7) was beyond its authority*." (emphasis added)).  Yet, despite Congress's failure to foresee the Court's ruling in *Seminole Tribe*, it spoke clearly in crafting a detailed remedial scheme that tightly circumscribed when the Secretary could issue Class III gaming procedures absent a compact.  Notably, Congress established a judicial finding of bad faith negotiation by the state as a precondition for the issuance of such procedures.

In conducting our *Chevron* step-one analysis, we "[e]mploy[ ] traditional tools of statutory construction."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987); *accord Chevron*, 467 U.S. at 843 n.9; *De Niz Robles v. Lynch*, 803 F.3d

31

1165, 1173 (10th Cir. 2015) ("[T]o reach *Chevron* step two the agency must first establish that traditional tools of statutory interpretation fail to reveal 'what the law has always meant.'"). "These tools include examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (quoting *Harbert*, 391 F.3d at 1147); *see Keller*, 848 F.3d at 1269 ("The 'plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.' If the statute is not ambiguous, our inquiry ends there." (citation omitted) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 341 (1997))). Thus, we read statutory language in context because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). We also "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."[7] *Id.* at 133 (citing *MCI Telecomms. Corp v. AT&T Co.*,

---

[7]     The Court explained in *Brown & Williamson Tobacco* that this analysis is applicable to *Chevron* step one and can constitute evidence of clear Congressional intent:

> Finally, our inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, by the *nature of the question presented*. Deference under *Chevron* to an
>
> (continued...)

512 U.S. 218, 231 (1994)).  We begin with an examination of IGRA's text and structure.

### a

Here, unlike in *Chevron*—where the Court held that the broad language of the Clean Air Act did not foreclose the EPA's interpretation, *see* 467 U.S. at 861—the text of IGRA is explicit.  Indeed, its remedial process is so specific and

------

[7](...continued)

     agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.  *See Chevron*, [467 U.S. at 844].  In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation.  *Cf.* Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986) ("A court may also ask whether the legal question is an important one.  Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.").

. . . .

     As in *MCI* [*Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)], we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.  To find that the FDA has the authority to regulate tobacco products, one must not only adopt an extremely strained understanding of "safety" as it is used throughout the Act—a concept central to the FDCA's regulatory scheme—but also ignore the plain implication of Congress' subsequent tobacco-specific legislation.  It is therefore clear, based on the FDCA's overall regulatory scheme and the subsequent tobacco legislation, that Congress has directly spoken to the question at issue and precluded the FDA from regulating tobacco products.

529 U.S. at 159–61 (emphasis added).

detailed as to verge on the mechanical.  There's simply no play in the joints of this scheme that would permit the Secretary to issue gaming procedures outside of the narrow circumstances prescribed by Congress.

"Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Brown & Williamson*, 529 U.S. at 125 (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)).  In IGRA, Congress created an administrative structure that assigns federal courts—not DOI—primary responsibility for facilitating tribal-state compacts.  The statute envisions a role for DOI only after: (1) a tribe sues a state 180 days after it first requested negotiations; (2) a court has made a finding of bad faith on the part of the state; (3) following such a finding, the parties fail to conclude a compact within sixty days, as directed by the court; and (4) after such failure and the court's appointment of a mediator, the state fails to consent to a mediator-proposed compact within sixty days of its being proposed.  *See* 25 U.S.C. § 2710(d)(7)(B).

Furthermore, even where all of these steps have been met, the Secretary's role is limited: "the Secretary shall prescribe, in consultation with the Indian tribe, procedures . . . which are consistent with the proposed compact selected by the [court-appointed] mediator . . . , the provisions of this chapter, and the relevant provisions of the laws of the State."  25 U.S.C. § 2710(d)(7)(B)(vii)(I).

34

Notably, Congress has narrowly circumscribed the Secretary's authority in prescribing procedures by cross-referencing previous steps in the judicial remedial process.  Accepting DOI's arguments would sweep away these statutory requirements.

To be sure, once the process has reached the point where the Secretary is statutorily authorized to prescribe procedures, there arguably could be more than one permissible reading of the Secretary's authority—for example, regarding what it means to adopt procedures "consistent with the proposed compact."  *Id.*  But there is no ambiguity as to *when* the Secretary's authority is triggered.  Part 291 attempts an end run around this clear statutory language by purporting to empower the Secretary to step in without a finding of bad faith if a state asserts sovereign immunity and that assertion results in dismissal of the suit.  25 C.F.R. § 291.3.  At bottom, the Secretary is attempting to rewrite IGRA.

In *MCI Telecommunications Corp. v. AT&T Co.*, the Supreme Court struck down the Federal Communications Commission's ("FCC") attempt to fundamentally alter a statutory scheme of regulation, even though Congress had expressly delegated to the FCC broad power to "modify any requirement" of the statutory provision at issue.  *See* 47 U.S.C. § 203(b)(2); 512 U.S. at 234.  The Court reasoned that the statute's "modify" language cannot mean "to change fundamentally," 512 U.S. at 227, and that the FCC had embarked on "a fundamental revision of the statute, changing it from a [statutorily mandated]

scheme of rate regulation in long-distance common-carrier communications to a scheme of rate regulation only where effective competition does not exist," *id.* at 231–32.  The Court struck down this attempted rewrite, characterizing it as "effectively the introduction of a whole new regime of regulation (or of free-market competition), which may well be a better regime but is not the one that Congress established." *Id.* at 234.  We find ourselves in a similar place.

The remedial scheme adopted by DOI differs from that created by Congress in fundamental ways.  First, IGRA requires a finding by a federal court that a state failed to negotiate in good faith, 25 U.S.C. § 2710(d)(7)(A), whereas Part 291 has no such requirement, 25 C.F.R. § 291.3.  Furthermore, under the statute, if a tribe and state fail to reach an agreement within sixty days of being ordered to do so by the court, the court must appoint a mediator.  25 U.S.C. § 2710(d)(7)(B)(iv).  Under the regulations, on the other hand, the Secretary must appoint a mediator *only if* a state submits an alternative proposal.  25 C.F.R. § 291.9.  These differences are important, but they actually pale in comparison to the outcomes possible under each regime.

Irrespective of a state's good faith in bargaining, Part 291 guarantees to tribes the issuance of procedures for Class III gaming.  *See Texas*, 497 F.3d at 508 ("Under the Secretarial Procedures . . . it matters not that a state undertook good-faith negotiations with the tribe: The Secretary may prescribe Class III gaming irrespective of a state's good faith.").  "This result contravenes the plain

language of IGRA," *id.*, which allows for the possibility that a state will be able to carry its burden to show good faith, resulting in either a return to the negotiation table or the end of the road for a tribe's attempt to obtain a compact or procedures permitting gaming. *See id.* at 494 ("If the court finds the state negotiated in good faith, the tribe's proposal fails."). Thus, Part 291 completely upsets IGRA's "carefully crafted and intricate remedial scheme." *Seminole Tribe*, 517 U.S. at 73–74. Indeed, Part 291 is similar to the rule invalidated in *MCI* in that it fundamentally alters a statutory regulatory scheme. *Compare* 25 U.S.C. § 2710(d)(7)(B)(ii)–(iii) (requiring additional efforts to negotiate a tribal-state compact only after a judicial determination that the state failed to negotiate in good faith), *with* 25 C.F.R. §§ 291.7–.9, 291.11 (providing for the issuance of procedures permitting Class III gaming in every instance).

Congress has not delegated to the Secretary express authority to make such fundamental alterations to IGRA's statutory requirements. At best, DOI's authority to issue the regulations in question rests on its "general authority" under 25 U.S.C. §§ 2, 9, combined with the specific mandates in IGRA itself. *See* Aplt. DOI's Opening Br. at 46. In this regard DOI's position is even weaker than that of the FCC in *MCI*: DOI has no express authority to "modify any requirement," 512 U.S. at 225, of the statutory scheme established by Congress in IGRA. The absence of such an express delegation of authority is conspicuous.

Moreover, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Brown & Williamson Tobacco*, 529 U.S. at 133. We are confident that Congress did not intend to implicitly delegate such authority to the Secretary given the "significant governmental interests" of competing sovereigns—including the powerful economic interests involved in the regulation of Class III gaming—that it attempted to balance in IGRA. The balancing of such important interests is not "the kind of highly technical, specialized interstitial matter that Congress often does not decide itself, but delegates to specialized agencies to decide." *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 90 (2007). Had Congress intended to give such power to the Secretary, we believe that it would have done so in a clear manner; instead, it undertook to balance those interests itself in IGRA. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." (citing *MCI*, 512 U.S. at 231; *Brown & Williamson Tobacco*, 529 U.S. at 159–60)). We find implausible the Secretary's assertion of implicit power to create an alternative to the explicit and detailed remedial scheme that IGRA prescribes. On the contrary, IGRA expressly forecloses the procedures adopted by DOI in Part 291.

38

**b**

DOI argues that "Congress drew a map in which all roads lead to some kind of gaming procedures."  Aplt. DOI's Opening Br. at 34.  In particular, DOI relies on IGRA's legislative history, which it characterizes as "clearly establish[ing] that Congress's foremost goal was to ensure that tribes would have access to gaming procedures, and the specific process it formulated under Section 2710(d)(7) was in aid of that ultimate goal."  *Id.* at 36.  In addressing DOI's argument, we assume *arguendo* that an inquiry into legislative history is generally appropriate at *Chevron* step one and, more specifically, that it is appropriate even where the statute's text and structure evince Congress's intent with crystalline clarity, as here.  *Compare Vill. of Barrington v. Surface Trans. Bd.*, 636 F.3d 650, 666 (D.C. Cir. 2011) (stating, "we would be uncomfortable relying on such legislative history at *Chevron* step one"), *and Phillips Petroleum Co. v. Lujan*, 4 F.3d 858, 861 (10th Cir. 1993) ("The best evidence of Congressional intent is the text of the statute itself and where the language is unambiguous, our inquiry is complete."), *with Cardoza-Fonseca*, 480 U.S. at 432 n.12 (1987) ("[T]he plain language of this statute appears to settle the question before us. Therefore, we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses."), *and id.* at 446 (discussing *Chevron* and stating that

"[e]mploying traditional tools of statutory construction, we have concluded that
Congress did not intend the two [statutory] standards to be identical"), *and Nat.
Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Where
the terms of a statute are unambiguous, further judicial inquiry into the intent of
the drafters is *generally unnecessary. . . .*  Reference to statutory design and
pertinent *legislative history* may often shed new light on congressional intent,
notwithstanding statutory language that appears '*superficially clear.*'" (emphases
added) (citations omitted) (quoting *Am. Scholastic TV Programming Found. v.
FCC*, 46 F.3d 1173, 1180 (D.C. Cir. 1995)).  However, having examined the
legislative history, we conclude that it actually undermines DOI's position.

Significantly, DOI is unable to cite to any evidence from the legislative
history that substantiates its claim that Congress intended for IGRA's negotiations
process to *invariably* result in the issuance of Class III gaming procedures.  DOI
concedes that IGRA attempts to balance the competing interests of states and
tribes "on the basis of 'equal sovereign[ty]' between" them.  Aplt. DOI's Opening
Br. at 36 (alteration in original) (quoting S. Rep. No. 100-446, at 13 (1988), *as
reprinted in* 1988 U.S.C.C.A.N. at 3083).  In this regard, recognizing "the need to
provide some incentive for States to negotiate with tribes in good faith," Congress
chose "as the least offensive option, to grant tribes the right to sue a State if a
compact is not negotiated and chose to apply the good faith standard."  S. Rep.
No. 100-446, at 13–14 (1988), *as reprinted in* 1988 U.S.C.C.A.N. at 3084.  This

40

system of voluntary negotiation, fortified by the states' duty to bargain in good faith, aims to strike an appropriate balance between equal sovereigns.  Equal bargaining cannot be had, however, where the parties know that, absent an agreement, one side will nevertheless obtain its fundamental goals; yet, this is precisely the situation that the Part 291 regulations prescribe, where ultimately the tribe will secure gaming procedures.  Such an arrangement fundamentally alters the bargaining power of the parties and undoes Congress's delicate balancing of the competing state and tribal interests at stake—making Part 291 a far cry from the "least offensive option."

**c**

In IGRA, Congress effectively asserted that "in the final analysis, it is the responsibility of the Congress, consistent with its plenary power over Indian affairs, to balance competing policy interests and to adjust, where appropriate, the jurisdictional framework for regulation of gaming on Indian lands."  S. Rep. No. 100-446, at 3 (1988), *as reprinted in* 1988 U.S.C.C.A.N. at 3072.  In light of our reading of IGRA's statutory text, structure, and history—fortified by our common-sense assessment of the importance of the sovereign and economic interests at stake—we hold that Congress has spoken in IGRA to the specific issue addressed by the Part 291 regulations, and it has thus effectively foreclosed DOI's attempt to craft a parallel remedial scheme.

41

**3**

DOI offers two arguments that attempt to inject ambiguity into IGRA's otherwise unambiguous text.  First, DOI argues that "[c]ourts that have examined potential conflicts within a statute, including conflicts between statutory language and Congress's unambiguously expressed purpose, have held that those conflicts demonstrate an ambiguity that requires agency interpretation."  Aplt. DOI's Opening Br. at 38.  But the cases that DOI cites do not support this assertion.  *Scialabba v. Cuellar de Osorio*, --- U.S. ----, 134 S. Ct. 2191 (2014), dealt, not with tension between statutory purpose and text, but rather with the tension between the text of two parts of the same provision.  *Id.* at 2203 ("And § 1153(h)(3) does not speak unambiguously to the issue here—or more precisely put, it addresses that issue in divergent ways.  We might call the provision Janus-faced.  Its first half looks in one direction, toward the sweeping relief the respondents propose . . . .  But . . . the section's second half looks another way, toward a remedy that can apply to only a subset of those beneficiaries . . . .").  Similar textual situations are present in the other cases DOI cites.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 647 (2007) (finding ambiguity because the EPA could not "simultaneously obey the differing mandates of [Endangered Species Act] § 7(a)(2) and [Clean Water Act] § 402(b)"); *Lorenzo v. Mukasey*, 508 F.3d 1278, 1283 (10th Cir. 2007) (addressing conflict between two provisions of the Immigration and

Naturalization Act).  DOI's citation to *Brown & Williamson Tobacco*'s recitation of the familiar canon that statutory language should be read in context fails to establish that tensions between statutory text and perceived legislative purpose create interpretive space for an agency to fill.  Further, as explained *supra*, DOI is mistaken in asserting that, in IGRA, Congress intended for the process to always result in permitting Class III gaming—IGRA's text and history do not bear that out.

Second, DOI argues "that a subsequent court decision can reveal ambiguity in a statute."  Aplt. DOI's Opening Br. at 40.  In support of this position, DOI cites three cases from our sister circuits.  All of these cases involved the Commissioner of Social Security's administration of the Coal Act, 26 U.S.C. § 9701 *et seq.*—less commonly known as the Coal Industry Retiree Health Benefit Act—a regulatory scheme designed in part "to identify the coal operators most responsible for benefit plan liabilities and to enlist them to provide benefits to retirees" who might otherwise not receive benefits.  *See, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385, 390–92 (4th Cir. 2004).  The Coal Act did so by requiring the Commissioner to assign retirees to an operator remaining in business and signatory to a relevant coal wage agreement.  *See* 26 U.S.C. § 9706(a).  Three such categories of operators were enumerated, with the second serving as a fallback in case no operator fell under the first category with respect to that

43

retiree, and the third category serving as a fallback in case the retiree could not be assigned under the first or second categories.  *Id.*

In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), however, the Supreme Court struck down the application of the third category to certain operators, based on the severe retroactive liability imposed on them.  *Id.* at 536–37.  In response, the Commissioner made assignments under the third category to a more limited universe of employers, resulting in a greater number of assignments and therefore an increase in pension liability to some operators.  *E.g.*, *Pittston Co.*, 368 F.3d at 401–02.  Three circuits—the Fourth, Sixth, and Eleventh—upheld this administrative action.  *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1288–89 (11th Cir. 2007); *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005); *Pittston Co.*, 368 F.3d at 403.

The theory relied on in these cases, and by DOI here, is that cases such as *Eastern Enterprises* and *Seminole Tribe* reveal ambiguity latent in a statute from the date of its enactment, as courts do not create but rather find the law, and Congress's action contrary to the Constitution is a nullity.  *See Texas*, 497 F.3d at 515–16 (Dennis, J., dissenting) (analyzing these cases and stating, "The Supreme Court does not create law, it discovers it—and the Supreme Court did not create the gap in this case, but merely declared its existence.  Congress itself created the gap or ambiguity by mistakenly overestimating its powers and passing a statute that could not be constitutionally applied as Congress intended."); Aplt. DOI's

44

Opening Br. at 40–44.  As this argument goes, in passing a regulatory regime

unconstitutional in part, Congress has implicitly left a gap that the agency

charged with the statute's administration can fill.  As an initial matter, we agree

with the opinion of Chief Judge Jones in *Texas* that the extracircuit cases that

DOI cites are distinguishable from this case.  The Court's decision in *Eastern*

*Enterprises* did not completely strike down the third Coal Act category but merely

narrowed it and the administrator attempted to carry out the statutory command in

light of the Court's holding, rather than circumventing the Coal Act.  *See Texas*,

497 F.3d at 505 n.13.

> But we discern an even more fundamental reason to reject DOI's argument;

it confuses unconstitutionality with ambiguity.  The Supreme Court has

consistently described *Chevron* as creating a presumption that Congress intends

statutory ambiguity to be resolved by the agency entrusted with a statutes'

administration:

> *Chevron* is rooted in a background presumption of congressional intent: namely, "that Congress, when it left ambiguity in a statute" administered by an agency, "understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows."  *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.  Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion.

*City of Arlington v. FCC*, --- U.S. ----, 133 S. Ct. 1863, 1868 (2013) (citations omitted).  As this language from *City of Arlington* suggests, *Chevron* deference is tied to statutory interpretation and statutory text, and thereby to congressional intent as filtered through the requirements of bicameralism and presentment.  Thus, we are required to apply *Chevron* deference to a permissible agency interpretation of a statute that is silent or ambiguous on the specific question at issue.

      *Chevron* does not, however, contemplate that a judicial decision, like *Seminole Tribe*, could turn a clear, unambiguous statute into an ambiguous one, by declaring a portion of it unconstitutional.  The Supreme Court has never held that, in crafting a partially unconstitutional regulatory regime, Congress has necessarily delegated to the relevant administrative agency the power to fundamentally revise that regime in order to work around an area that had been declared unconstitutional.  Such a background presumption as DOI urges would turn our constitutional order on its head.  As one of our former colleagues has pithily stated, "When the political branches disagree with a judicial interpretation of existing law, the Constitution prescribes the appropriate remedial process.  It's called legislation." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151 (10th Cir. 2016) (Gorsuch, J., concurring).  As applied here, this proposition means to us

that the power to remedy the defects in IGRA's remedial scheme lies *not* with

DOI, but with Congress.[8]

Thus, the unconstitutionality of IGRA's jurisdiction-granting provision

does not render the enactment any less clear than the text was when Congress

passed it and the President signed it.  And, as demonstrated above, Congress has

spoken clearly in IGRA regarding the circumstances in which the Secretary can

issue Class III gaming procedures to a tribe that has not entered into a compact

with a state.  "Congress knows to speak in plain terms when it wishes to

circumscribe, and in capacious terms when it wishes to enlarge, agency

discretion."  *City of Arlington*, 133 S. Ct. 1868.  In IGRA, Congress spoke in

plain rather than capacious terms.  That it mistook the extent of its power under

the Constitution does not thereby evince an agency delegation.  The

unconstitutionality of a provision does not make the language of IGRA more or

less plain or capacious.  While executive agencies may well wield "[t]he power of

---

[8]    In its reply brief, DOI underscores that "[t]he ambiguity lies in Section 2710(d)(7)(B)(vii), which authorizes the Secretary to prescribe gaming procedures for a tribe."  Reply Br. at 14.  DOI contends that, although IGRA authorizes it to prescribe procedures when, as here, the State has not consented to the proposed compact, and constrains how it should do so, by obliging it to seek to be consistent with the proposed compact drawn up by the court-appointed mediator, "Congress simply failed to specify how the Secretary must exercise her authority in the absence of a mediator."  *Id.* at 14–15.  In this regard, DOI notes that it is a state's act of invoking sovereign immunity in a tribe's IGRA lawsuit that causes "the IGRA process [to be] cut short before a mediator is appointed."  *Id.* at 14.  We are not given pause by DOI's contention.  It is simply another way of asserting that *Seminole Tribe*, by allowing the states to successfully invoke sovereign immunity, has created an ambiguity in IGRA—a position that we reject here.

47

executing the laws," which "necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration" that emphatically "does not include a power to revise clear statutory terms that turn out not to work in practice." *Util. Air Regulatory Grp. v. EPA*, --- U.S. ----, 134 S. Ct. 2427, 2446 (2014). Part 291 is just such an attempt at statutory revision by administrative rulemaking.

***************

In sum, we hold that IGRA unambiguously forecloses the Part 291 regulations. Accordingly, we do not proceed to *Chevron* step two. The Part 291 regulations are invalid and unenforceable.

<strong>D</strong>

Lastly, we turn to the primary argument asserted in the Pojoaque's brief—namely, that the Supreme Court's decision in *Seminole Tribe* requires us to strike down additional provisions of IGRA under a severability analysis. In *Seminole Tribe*, the Supreme Court expressly declined to consider the extent to which the portion of the statute concerning Class III gaming procedures remained intact following its holding that Congress lacked authority to make states subject to suits brought by tribes under 25 U.S.C. § 2710(d)(7). *See* 517 U.S. at 76 n.18 ("We do not here consider, and express no opinion upon, that portion of the decision below that provides a substitute remedy for a tribe bringing suit." (citing *Seminole Tribe of Fla. v. Florida*, 11 F.3d 1016, 1029 (11th Cir. 1994) ("The final

48

question we must resolve is whether all provisions for state involvement in

[C]lass III gaming also fail, as the tribes contend.  We hold that they do not.”)))

The Pojoaque argue that we should now take up this issue and strike down other

provisions of IGRA because the jurisdiction-granting clause at issue in *Seminole*

*Tribe* is not severable.  We first address New Mexico’s objections to our reaching

the merits of the Tribe’s contentions.

New Mexico argues that, in the district court, the Pojoaque “agree[d] to

limit its proposed argument for summary judgment to the narrow legal question of

whether the [DOI] had authority to promulgate the [Part 291 regulations],” and

the court granted the Tribe permissive intervention on the condition that it honor

that agreement.  Aplee.’s Supp. App. at 71; *see* Aplee.’s Br. at 69; *see also* 7C

Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1922 (3d ed. 1998) (“Since the trial court has full discretion to

grant or deny an application for permissive intervention under Rule 24(b), it may

if it chooses impose conditions on its grant of the application.” (footnote

omitted)).  Second, New Mexico argues that its complaint focused exclusively on

the validity of the Part 291 regulations and that neither DOI nor the Pojoaque

filed or sought to file a responsive pleading to inject into this action a severability

challenge to the balance of IGRA’s provisions.  Therefore, New Mexico reasons

that this challenge is not properly before us.

49

Neither of these arguments is ultimately persuasive.  We address them in turn.  Regarding the district court's limitation of the Pojoaque's arguments for purposes of the summary judgment briefing below, the context shows that the court was focused on barring the Tribe from raising the question of whether New Mexico had negotiated in good faith—an issue the Tribe wished to litigate.  *See* Aplee.'s Supp. App. at 71–72.  That understanding of the limitation imposed is reflected in the district court's decision to undertake an analysis of the severability issue in its order.  *See* Aplts.' App. at 64–66.  Nor does it appear from New Mexico's briefing or the appendices filed with this court that New Mexico objected on the ground of this limitation to the Pojoaque's injection of the severability issue into the district court litigation.

As to the argument that the Pojoaque are limited to litigating the issues raised in the pleadings, a similar failure to object decides the issue.  Federal Rule of Civil Procedure 15(b) permits amendment during or after trial to conform to the evidence via two mechanisms.  First, an issue may be tried by express or implied consent, if no objection is made.  *See Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1280 (10th Cir. 2004).  When the opposing party fails to object, or itself introduces evidence on the issue (except for evidence relevant to an issue already in the case), then it has impliedly consented to amendment.  *Id.*  Second, if the opposing party objects, Rule 15(b) requires the party wishing to inject the new issue to move to amend the pleading; if that party

50

does so, then the court should liberally grant amendment *unless* the opposing party makes a sufficient showing of prejudice. *See id.* at 1280–81.

Although Rule 15(b) contemplates that this process will occur at trial, we have recognized such "constructive amendment" may also take place at the summary judgment stage. *See Ahmad v. Furlong*, 435 F.3d 1196, 1202–04 (10th Cir. 2006) (holding that district court erred by precluding defendant from constructively amending through briefing on summary judgment to add an affirmative defense); *see McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (holding that First Amendment retaliation claim not in plaintiff's complaint or summary judgment briefing but addressed by district court was properly before us because defendant did not object or argue that he was prejudiced and plaintiff had raised a Sixth Amendment retaliation claim in her summary judgment briefing); *cf. Green Country Food Mkt.*, 371 F.3d at 1280–81 (affirming district court's refusal under Rule 15(b) to consider an issue not presented in complaint and raised only in summary judgment briefing, but only because opposing party objected and plaintiff did not move to amend). These cases control.

Here, there is no evidence that the State objected to the Tribe's injection of this issue into the litigation, nor was any argument presented to the district court or this court that the State was thereby prejudiced. Indeed, inspection of the district court's docket shows that the State affirmatively engaged the issue in their summary judgment briefing. *See* Opposition to Federal and Intervenor

Defendants' Motions for Summary Judgment at 22–23, *New Mexico v. Dep't of the Interior*, No. 14-cv-695-JAP/SCY (D.N.M. Oct. 6, 2014), ECF No. 41.[9] Because the State failed to object below or argue that it was prejudiced by having to address the Tribe's severability argument, the district court did not abuse its discretion by considering the argument, and we proceed to the merits of it now.

Generally, "[a] court should refrain from invalidating more of the statute than is necessary." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). When one provision of an enactment is struck down, "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (per curiam)); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 132 S. Ct. 2566, 2607 (2012) ("[W]e seek to determine what Congress would have intended in light of the Court's constitutional holding." (quoting *United States v. Booker*, 543 U.S. 220, 246 (2005))). In the past, this court has always applied this standard.[10] *See Kikumura v. Hurley*, 242 F.3d 950, 959–60

---

[9]      *See, e.g.*, *Milligan-Hitt v. Bd. of Trs. of Sheridan Cty. Sch. Dist. No. 2*, 523 F.3d 1219, 1231 (10th Cir. 2008) ("The record on appeal comprises all of 'the original papers and exhibits filed in the district court; . . . the transcript of proceedings if any; . . . and a certified copy of the docket entries prepared by the district clerk.'" . . . We sometimes refer to this appendix colloquially as the record on appeal, but technically it is not." (footnote and citations omitted) (quoting Fed. R. App. P. 10(a)).

[10]      The Tribe argues that *Alaska Airlines* creates a two-prong test where we
(continued...)

(10th Cir. 2001); *Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119,

1123 (10th Cir. 1998).  The Supreme Court has sometimes framed this inquiry as

"[w]ould the legislature have preferred what is left of its statute to no statute at

all?"  *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 330 (2006);

*see also Booker*, 543 U.S. at 249 ("We then compare our own remedy to the total

invalidation of the statute, and conclude that Congress would have preferred our

remedy.").

---

[10](...continued)
must ask both whether the statute will operate consistently with congressional intent and
whether Congress would have adopted the statute without the unconstitutional provision.
Aplt. Pueblo of Pojoaque's Opening Br. at 10–12.  Its authority for this assertion is
primarily *NFIB*'s dissent.  *See id.* at 10 (citing *NFIB*, 132 S. Ct. 2566 (Scalia, J.,
dissenting)).  The dissent argued that this statutory functionality inquiry was the first step
in a "two-part guide as the framework for severability analysis."  *Id.* at 2668.  At the same
time, however, Justice Scalia implied that often the functionality inquiry is simply a
proxy for the legislative intent inquiry.  *See id.* at 2669 ("In the ordinary course, if the
remaining provisions cannot operate according to the congressional design, (the first
inquiry), it almost necessarily follows that Congress would not have enacted them (the
second inquiry).  This close interaction may explain why the Court has not always been
precise in distinguishing between the two.  There are, however, occasions in which the
severability standard's first inquiry (statutory functionality) is not a proxy for the second
inquiry (whether the Legislature intended the remaining provisions to stand alone).").
Justice Scalia, together with the other dissenters, would have relied on the independence
of the first inquiry to hold that the rest of the ACA must fall along with the individual
mandate and the provision cutting off Medicaid funds to states that chose not to adopt the
expansion.  *See id.* at 2671–77.  As far as we can tell, however, the Court has never held
squarely that the statutory functionality inquiry is independent of the legislative intent
question, though it has on occasion employed it.  *See Alaska Airlines*, 480 U.S. at 685; *cf.*
*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd. (PCAOB)*, 561 U.S. 477, 509
(2010) ("The Sarbanes-Oxley Act remains 'fully operative as a law' with these tenure
restrictions excised." (quoting *New York v. United States*, 505 U.S. 144, 186 (1992))).
Thus, we do not consider the statutory functionality inquiry as separate from the
"touchstone" criterion of legislative intent.  *NFIB*, 132 S. Ct. at 2607 (Roberts, C.J.);
*accord Ayotte*, 546 U.S. at 330.

Additionally, it is well-established that "[t]he inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute." *Alaska Airlines*, 480 U.S. at 686.  A severability clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Id.*  This presumption can be overcome only by "strong evidence": "[U]nless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute." *Id.*  IGRA includes a severability clause.  *See* 25 U.S.C. § 2721.

As a preliminary matter, the Tribe asks that, if we find that Congress would not have passed IGRA in the absence of the ability to subject states to suits brought by tribes, we should engage in an elaborate editing of IGRA such that the Part 291 regulations could be upheld.  *See* Aplt. Pueblo of Pojoaque's Opening Br. at 25–27 (offering an edited version of IGRA's remedial provisions).  Just as we have held that it is not the place of the executive branch to rewrite legislative enactments, so too it is ordinarily not the task of the judiciary to rewrite a statute. *See PCAOB*, 561 U.S. at 509–10 ("In theory, perhaps, the Court might blue-pencil a sufficient number of the Board's responsibilities so that its members would no longer be 'Officers of the United States.'  Or we could restrict the Board's enforcement powers, so that it would be a purely recommendatory panel.  Or the Board members could in future be made removable by the President, for good

54

cause or at will.  But such editorial freedom—far more extensive than our holding today—belongs to the Legislature, not the Judiciary."); *Ayotte*, 546 U.S. at 329 ("[M]indful that our constitutional mandate and institutional competence are limited, we restrain ourselves from 'rewrit[ing] state law to conform it to constitutional requirements' even as we strive to salvage it." (alteration in original) (quoting *Virginia v. Am. Booksellers Ass'n., Inc.*, 484 U.S. 383, 397 (1988))).  We will not engage in such judicial editing of a statute.  IGRA's jurisdiction-granting clause falls alone or it falls with *all* of IGRA.  We turn to whether strong evidence shows that Congress would not have passed IGRA without that clause, looking to whether Congress would prefer no IGRA to its current state and whether, in its current state, it is capable of operating consistently with Congress's intent.

As should be clear from our description, *supra*, of IGRA's remedial scheme, the provision permitting tribes to hale states into court is important. Congress had difficulty finding a proper incentive to bring states to the negotiation table.  *See* S. Rep. No. 100-446, at 13 (1988), *as reprinted in* 1988 U.S.C.C.A.N. at 3083 ("The practical problem in formulating statutory language to accomplish the desired result is the need to provide some incentive for States to negotiate with tribes in good faith because tribes will be unable to enter into such gaming unless a compact is in place.  That incentive for the states has proved elusive.").  Congress considered a judicially enforced duty of good-faith

negotiation as the "least offensive option," which would "best . . . encourage

States to deal fairly with tribes as sovereign governments." *Id.* at 14, *as reprinted

in* 1988 U.S.C.C.A.N. at 3084. Absent this mechanism, recalcitrant states need

not fear being forced into a compact, and tribes, having lost their best alternative

to a negotiated agreement, have seen their bargaining position diminished.

However, as even the Pojoaque must concede, *Seminole Tribe* does not so

completely stymie Congress's intent in IGRA.[11]

    The Pojoaque concede at least three situations in which IGRA could

function largely as intended. *See* Aplt. Pueblo of Pojoaque's Opening Br. at 35;

Aplt. Pueblo of Pojoaque's Reply Br. at 22. First, at least one state, California,

has categorically waived by statute its sovereign immunity as to IGRA claims.

*See Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019,

1026 (9th Cir. 2010). Second, a state may simply choose not to raise an

otherwise available sovereign-immunity defense, as the Pojoaque concede

---

[11]    The Tribe urges us to consider as evidence statements by Senator Inouye made after the passage of IGRA. *See* Aplt. Pueblo of Pojoaque's Opening Br. at 19–20. We decline to consider these statements, for two reasons. First, we have recently been reminded that "statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, --- U.S. ----, 137 S. Ct. 929, 943 (2017). Further, and dispositive for this question, the Supreme Court has held that "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation. Real (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law. But post-enactment legislative history by definition 'could have had no effect on the congressional vote.'" *Brausewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (citations omitted) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008).

occurred in *Northern Arapaho v. Wyoming*, 389 F.3d 1308, 1313 (10th Cir. 2004)

(reaching and deciding the merits of whether the state negotiated in good faith).

Third, the United States may sue on behalf of a tribe in its role as trustee,

sidestepping the sovereign immunity defense. *See United States v. Spokane Tribe*

*of Indians*, 139 F.3d 1297, 1301 (9th Cir. 1998); *see also Arizona v. California*,

460 U.S. 605, 614 (1983) (permitting intervention by Indian tribes against states

where the United States had already intervened on the tribes' behalf against the

states and recalling that "[n]othing in the Eleventh Amendment 'has ever been

seriously supposed to prevent a state's being sued by the United States'" (quoting

*United States v. Mississippi*, 380 U.S. 128, 140 (1965))).  The Pojoaque concede

that this third possibility "may indeed save the statute."  Aplt. Pueblo of

Pojoaque's Reply Br. at 22.  And tribes *may* even be able to sue the United States

to compel it to bring meritorious IGRA suits against states. *See Spokane Tribe*,

139 F.3d at 1301 n.5 (citing *Chemehuevi Indian Tribe v. Wilson*, 987 F. Supp. 804

(N.D. Cal. 1997)).  Thus, it appears that IGRA remains capable of functioning

largely as Congress intended it to.

Despite conceding that the United States' ability to bring IGRA suits

against the states "may indeed save the statute," the Tribe argues that "allowing

for the Part 291 regulation under severance analysis more closely tracks

Congress'[s] intent."  Aplt. Pueblo of Pojoaque's Reply Br. at 22.  But this

argument depends on (1) the selective editing of the statute that we have already

rejected, and (2) an understanding of IGRA's purpose and text that we have also rejected. The Tribe also argues that this just isn't the manner in which "Congress intended for states to be burdened." *Id.* That isn't clear, insofar as "[w]e assume that Congress knows the law and legislates in light of federal court precedent." *In re Antrobus*, 519 F.3d 1123, 1125 (10th Cir. 2008) (quoting *Bd. of Cty. Comm'rs v. EEOC*, 405 F.3d 840, 845 (10th Cir. 2005)). We can safely assume that Congress understood that it was also possible for the United States to bring an IGRA claim on a tribe's behalf.

Ultimately, the severability question is a close one. On one side, the centrality of the ability of tribes to sue states weighs against severability. On the other, IGRA may nonetheless function largely as intended, cutting in favor of severability. Here, the presumption established by the severability clause is important. In light of Congress's express inclusion of a severability clause and the ways in which IGRA may continue to function largely as intended, we hold that the jurisdiction-granting provision is severable from the rest of IGRA. We cannot say that it is clear that Congress would prefer no legislation to IGRA as it stands after *Seminole Tribe*. We decline to strike down the rest of IGRA.

### III

For the foregoing reasons, we **AFFIRM** the district court's judgment.

58

FILED
United States Court of Appeals
Tenth Circuit

**April 21, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

STATE OF NEW MEXICO,

     Plaintiff - Appellee,

v.

DEPARTMENT OF INTERIOR; RYAN
ZINKE, in his official capacity as Secretary
of the Interior,[*]

     Defendants - Appellants,

and

PUEBLO OF POJOAQUE, a federally-
recognized Indian Tribe,

     Intervenor Defendant - Appellant.

Nos. 14-2219 & 14-2222
(D.C. No. 1:14-CV-00695-JAP-SCY)
(D. N.M.)

_____

## JUDGMENT
_____

Before **HOLMES**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

    These cases originated in the District of New Mexico and were argued by counsel.

    The judgment of that court is affirmed.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

---

    [*] Pursuant to Fed. R. App. P. 43(c)(2), Ryan Zinke, who is the current Secretary of
the Interior, is automatically substituted for Sally Jewell as Defendant in this case.