Nos. 14-2219 and 14-2222
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

STATE OF NEW MEXICO,
Plaintiff-Appellee

v.

UNITED STATES DEPARTMENT OF THE INTERIOR,
Defendant-Appellant

PUEBLO OF POJOAQUE,
Defendant-Intervenor-Appellant.
_____

On Appeal from the United States District Court
for the District of New Mexico
No. 1:14-cv-00695-JAP-SCY (Hon. James A. Parker)
_____

APPELLEE'S RESPONSE TO
PETITION FOR REHEARING AND REHEARING EN BANC
_____

Jennifer A. MacLean
JMacLean@perkinscoie.com
PERKINS COIE LLP
700 13th St., N.W., Suite 600
Washington, D.C. 20005
Telephone: 202.654.6200

Eric D. Miller
EMiller@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................... 1

Argument ......................................................................... 2

    I.    The panel correctly applied *Chevron* ..................................... 2

        A.    The Part 291 regulations are contrary to IGRA's unambiguous language ................................. 3

        B.    The Pueblo's contrary arguments lack merit .............. 7

        C.    The panel's decision can be upheld on other grounds ........................................................ 8

    II.    The Pueblo's severability arguments lack merit ................. 14

Conclusion ...................................................................... 19

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Alaska Airlines, Inc.* v. *Brock,*
    480 U.S. 678 (1987) .............................................................. 14

*Am. Fed'n of Labor & Cong. of Indus. Orgs.* v. *Chao,*
    409 F.3d 377 (D.C. Cir. 2005) ........................................... 14

*Beers* v. *Arkansas,*
    61 U.S. (20 How.) 527 (1858) ............................................ 12

*Chevron USA Inc.* v. *NRDC,*
    467 U.S. 837 (1984) ................................................... *passim*

*Coll. Sav. Bank* v. *Fla. Prepaid Postsecondary Educ. Expense
    Bd.,*
    527 U.S. 666 (1999) ............................................................ 12

*Contreras-Bocanegra* v. *Holder,*
    678 F.3d 811 (10th Cir. 2012) ............................................. 7

*Edward J. DeBartolo Corp.* v. *Fla. Gulf Coast Bldg. &
    Constr. Trades Council,*
    485 U.S. 568 (1988) ............................................................ 10

*Fed. Mar. Comm'n* v. *S.C. State Ports Auth.,*
    535 U.S. 743 (2002) ............................................................ 11

*Gozlon-Peretz* v. *United States,*
    498 U.S. 395 (1991) ............................................................ 10

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius,*
    567 U.S. 519 (2012) ............................................................ 13

*Sac and Fox Nation of Mo.* v. *Norton,*
    240 F.3d 1250 (10th Cir. 2001) .......................................... 10

# TABLE OF AUTHORITIES
(continued)

**Page**

*Seminole Tribe of Fla.* v. *Florida*,
 11 F.3d 1016 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996) .................... 18

*Seminole Tribe of Fla.* v. *Florida*,
 517 U.S. 44 (1996) ........................................................................ 3, 11

*Texas* v. *United States*,
 497 F.3d 491 (5th Cir. 2007) ........................................................ 1, 18

*United States* v. *Home Concrete & Supply, LLC*,
 132 S. Ct. 1836 (2012) ....................................................................... 16

*United States* v. *Jicarilla Apache Nation*,
 564 U.S. 162 (2011) .............................................................................. 6

*United States* v. *Mead Corp.*,
 533 U.S. 218 (2001) .............................................................................. 9

*United States* v. *Spokane Tribe of Indians*,
 139 F.3d 1297 (9th Cir. 1998) ........................................................... 18

*Util. Air Regulatory Grp.* v. *EPA*,
 134 S. Ct. 2427 (2014) ....................................................................... 17

**CONSTITUTION AND STATUTES**

U.S. Const. amend. XI ................................................................... 1, 8, 11

25 U.S.C. § 9 ......................................................................................... 9

Indian Gaming Regulatory Act,
 Pub. L. No. 100-497, 102 Stat. 2467 ......................................... *passim*

 25 U.S.C. § 2706(b)(10) ................................................................. 9

 25 U.S.C. § 2709 ......................................................................... 9, 10

 25 U.S.C. § 2710(d)(7) ..................................................................... 4

# TABLE OF AUTHORITIES
(continued)

**Page**

25 U.S.C. § 2710(d)(7)(B) ...................................................... 12, 13, 14

25 U.S.C. § 2710(d)(7)(B)(iv) .................................................... 5

25 U.S.C. § 2710(d)(7)(B)(vi) .................................................... 6

25 U.S.C. § 2710(d)(7)(B)(vii) ................................................... 6

## RULES

Fed. R. App. P. 35(a)(2) ............................................................ 3

## OTHER AUTHORITIES

25 C.F.R. Part 291 ......................................................... *passim*

25 C.F.R. § 291.3 ............................................................... 3, 7

25 C.F.R. § 291.11(c) .............................................................. 6

25 C.F.R. Part 501 *et seq.* ....................................................... 9

Class III Gaming Procedures, 64 Fed. Reg. 17,535 (Apr. 12, 1999) ................................................................................. 5

64 Fed. Reg. 17,536 (Apr. 12, 1999) ....................................... 12

## INTRODUCTION

The Indian Gaming Regulatory Act (IGRA), Pub. L. No. 100-497, 102 Stat. 2467 (25 U.S.C. § 2701 *et seq.*), requires an Indian tribe that wishes to conduct casino-style gaming to negotiate a compact with the State. If the tribe and the State are unable to agree, the statute provides a limited and precisely defined remedy: the tribe may sue the State in federal court. The Secretary of the Interior, however, has adopted regulations providing for the imposition of Secretarial Procedures allowing gaming when a State has invoked its Eleventh Amendment immunity in response to a suit by a tribe. 25 C.F.R. Part 291. The district court correctly held that the regulations exceed the Secretary's statutory authority, and the panel correctly affirmed its judgment. The Secretary has declined to seek further review.

The panel's decision does not conflict with any decision of the Supreme Court, of this Court, or of any other court of appeals. Only one other court of appeals has addressed the validity of the Part 291 regulations. In that case, which is mentioned nowhere in the Pueblo of Pojoaque's petition for rehearing, the Fifth Circuit reached the same result as the panel here and invalidated the regulations. *Texas* v.

- 1 -

*United States*, 497 F.3d 491 (5th Cir. 2007). Granting the petition for rehearing and reversing the district court's judgment would not resolve a circuit conflict; it would create one. The petition should be denied.

## ARGUMENT

### I. The panel correctly applied *Chevron*

The Pueblo argues that the panel misapplied *Chevron USA Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and cases applying that decision. The Pueblo does not allege any inter- or intra-conflict in the application of *Chevron* to the Part 291 regulations, for there is none. To the contrary, as noted above, the only other court of appeals to consider the regulations reached the same result as the panel in this case. Nor does the Pueblo allege that the panel misstated the rule established in *Chevron*. Rather, despite its rhetoric (*e.g.*, Pet. 6 ("the April 21 Opinion only paid lip service to the *Chevron* step-one standard")), the petition implicitly acknowledges that the panel correctly articulated the *Chevron* test.

At most, then, the petition alleges that the panel misapplied a correctly stated rule to the specific circumstances of this case. Even if that were correct, it would not warrant en banc review. Certainly the

Pueblo has not attempted to demonstrate that the validity of the Part 291 regulations is inherently "a question of exceptional importance," Fed. R. App. P. 35(a)(2). Such an assertion would not be plausible, particularly in light of the Secretary of the Interior's decision not to seek further review of the panel's decision. In any event, the panel's application of *Chevron* was correct.

## A.    The Part 291 regulations are contrary to IGRA's unambiguous language

The panel correctly recognized that the *Chevron* analysis must "begin with the question of whether the statute unambiguously addresses the 'precise question at issue.'" Slip op. 26 (quoting *Chevron*, 467 U.S. at 842). And it understood that the relevant "question at issue" is the one expressly presented by the regulations themselves: "[w]hen may an Indian tribe ask the Secretary to issue Class III gaming procedures?" *Id.* at 30 (quoting 25 C.F.R. § 291.3). That question is answered by the unambiguous statutory text; Congress "spoke clearly in crafting a detailed remedial scheme that tightly circumscribed when the Secretary could issue Class III gaming procedures absent a compact." *Id.* at 31; *accord Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 74 (1996) ("Congress has prescribed a detailed remedial scheme for the

enforcement against a State of a statutorily created right."). The statute provides a judicial dispute-resolution process that gives the Secretary only a limited role. But the Part 291 regulations establish a remedial scheme that differs from that of the statute in several key ways. Thus, the panel correctly concluded that "[t]here's simply no play in the joints of this scheme that would permit the Secretary to issue gaming procedures outside of the narrow circumstances prescribed by Congress." Slip op. 34.

Several significant differences between the Part 291 regulations and IGRA's remedial scheme support the panel's conclusion that "[t]he remedial scheme adopted by [the Secretary] differs from that created by Congress in fundamental ways." Slip op. 36.

*First*, the regulations do not protect the right of a State to take a good-faith negotiating position that results in a bargaining impasse. The statute provides that before any remedial process can begin, the court must find that the State violated its obligation to negotiate in good faith; if the State has acted in good faith, the court may proceed no further. 25 U.S.C. § 2710(d)(7). The regulations, by contrast, require no such finding. 25 C.F.R. § 291.3; *see* Class III Gaming Proce-

dures, 64 Fed. Reg. 17,535, 17,537 (Apr. 12, 1999) ("The final regula-
tion eliminates the requirement that the Secretary make a finding on
the 'good faith' issue."). Instead, the State's assertion of immunity in
litigation is sufficient to permit the Secretary to initiate proceedings.
25 C.F.R. § 291.3.

   *Second*, the regulations do not protect the right of the State to a
neutral, court-appointed mediator. Under IGRA, if the State and the
tribe have failed to reach an agreement within 60 days of being or-
dered to do so, the court must appoint a mediator, who will select from
each side's "last best offer for a compact" the one that "best comports
with" the statute. 25 U.S.C. § 2710(d)(7)(B)(iv). Under the regulations,
by contrast, the Secretary may appoint the mediator. 25 C.F.R.
§ 291.9(b). While the regulations subject the mediator to a minimal
conflict-of-interest prohibition, *id.* § 291.9(a), they do nothing to insu-
late him or her from the political influence that can be expected to
result from appointment by the Secretary (who owes a trust obligation
to the tribe), rather than by an Article III judge (who does not).

   *Third*, the regulations grant the Secretary a power not granted
by the statute: the power to reject a mediator's proposed compact.

Under the statute, if the State consents to the mediator's proposed compact, then it will be treated as a tribal-state gaming compact. 25 U.S.C. § 2710(d)(7)(B)(vi). If the State does not consent, the Secretary is to prescribe gaming procedures, but they must be "consistent with the proposed compact selected by the mediator." *Id.* § 2710(d)(7)(B)(vii). Under the regulations, however, the Secretary is not bound to adopt the proposal that the mediator selects—whether or not the State has agreed to it—and may instead prescribe "appropriate procedures" of his own devising. 25 C.F.R. § 291.11(c). Indeed, the regulations contemplate that the Secretary may reject a mediator's selection for violating "the trust obligations of the United States to the Indian tribe." *Id.* § 291.11(b)(5). The "trust obligations of the United States" are extraordinarily broad and ill-defined. *See generally United States* v. *Jicarilla Apache Nation*, 564 U.S. 162, 173-78 (2011). By adding that term to the regulations, the Secretary allowed himself far more discretion to disapprove a mediator's compact than Congress provided in IGRA.

### B.    The Pueblo's contrary arguments lack merit

According to the Pueblo (Pet. 6), the panel failed to identify the "precise" question at issue but instead "materially broadened the question to eliminate the required precision and set up a straw man alternative that was obviously precluded." Although the Pueblo objects (Pet. 7) to the panel's statement of the question at issue, it ignores that the panel's statement was drawn directly from the language of the regulations themselves. Slip op. 30 (quoting 25 C.F.R. § 291.3).

As for the Pueblo's proposed alternative question, the panel considered it and appropriately rejected it. The Pueblo would ask "how to address gaming compacting when a State has asserted its immunity from suit," a question it says the statute does not address. Pet. 8 (quotation marks omitted). But as the panel observed, this Court has held that "*Chevron* does not require Congress to explicitly delineate everything an agency cannot do before we may conclude that Congress has directly spoken to the issue." Slip op. 29 (quoting *Contreras-Bocanegra* v. *Holder*, 678 F.3d 811, 818 (10th Cir. 2012) (en banc)). Congress *did* consider what to do when compact negotiations fail, and it created a remedial scheme that looks nothing like the Secretary's. Nothing in

*Chevron*—or in any of the other decisions cited by the Pueblo, none of which involved IGRA—suggests that Congress had to specifically limit the Secretary's authority to create a different remedial scheme in the event that compact negotiations fail because of an assertion of Eleventh Amendment immunity.

### C.   The panel's decision can be upheld on other grounds

Even if the Pueblo's arguments had merit, rehearing would be inappropriate because the result reached by the panel can be upheld on other grounds. Although the panel had no need to consider those issues, they were fully briefed by the parties and would be before the Court on rehearing. First, the Part 291 regulations are not entitled to *Chevron* deference at all because the Secretary has not been delegated authority to make rules implementing IGRA. Second, to avoid the serious constitutional difficulties that the Secretary's interpretation creates, any ambiguity in IGRA must be resolved against that interpretation,. Third, the regulations reflect an unreasonable interpretation of the statute.

1. *Chevron* deference is applicable only when "Congress delegated authority to the agency generally to make rules carrying the force of

law, and . . . the agency interpretation claiming deference was promul-gated in the exercise of that authority." *United States* v. *Mead Corp.*, 533 U.S. 218, 226-27 (2001). The Secretary has no authority to make rules under IGRA because that statute vests the National Indian Gam-ing Commission (NIGC), not the Secretary, with rulemaking authority. Specifically, 25 U.S.C. § 2706(b)(10) grants the NIGC the power to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this chapter."

While the Secretary has general rulemaking authority under 25 U.S.C. §§ 2 and 9, Congress expressly abrogated that authority as it relates to IGRA: "[T]he Secretary shall continue to exercise those au-thorities vested in the Secretary on the day before [the enactment of the statute] relating to supervision of Indian gaming *until such time as the Commission is organized and prescribes regulations.*" *Id.* § 2709 (emphasis added). The Commission has long since promulgated regula-tions under IGRA, and it began to do so well before the Secretary promulgated the Part 291 regulations. *See generally* 25 C.F.R. Part 501 *et seq.* Accordingly, in the context of IGRA, the Secretary's general rulemaking authority is displaced by the specific allocation of authori-

ty to the Commission. *See Gozlon-Peretz* v. *United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls over one of more general application."). Section 2709 leaves no role for the Secretary to make rules to implement IGRA.

This Court has previously recognized that "neither the Secretary nor the Department of the Interior in general is charged with administering IGRA." *Sac and Fox Nation of Mo.* v. *Norton*, 240 F.3d 1250, 1265 (10th Cir. 2001). In *Sac and Fox Nation*, the Court held that because the Commission has been granted "the exclusive regulatory authority for Indian gaming conducted pursuant to IGRA," the Secretary's interpretations of the statute are not entitled to deference. *Id.*

2. Even if *Chevron* applied, and even if the text of IGRA were ambiguous, the Part 291 regulations would not survive step one of *Chevron*. Instead, as the Supreme Court has explained, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). In other words,

the canon of constitutional avoidance is one of the "traditional tools of statutory construction" that courts apply in determining whether Congress has left a gap for the agency to fill. *Chevron*, 467 U.S. at 843 n.9. Here, the regulations are constitutionally defective for two independent reasons; at a minimum, they raise serious constitutional questions.

First, the regulations directly violate the Eleventh Amendment. The Supreme Court recognized in *Seminole Tribe* that Congress may not abrogate a State's sovereign immunity from suit at the behest of a tribe. 517 U.S. at 76. The same principles of sovereign immunity protect the State from proceedings under Part 291. See *Fed. Mar. Comm'n* v. *S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) ("[I]f the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency.").

Second, even if Congress may compel States to submit to compulsory adjudication before the Secretary, it may not use the threat of

such adjudication to coerce them into surrendering their Eleventh Amendment immunity from suit in court. The decision to waive sovereign immunity must be "altogether voluntary on the part of the sovereignty." *Coll. Sav. Bank* v. *Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (quoting *Beers* v. *Arkansas*, 61 U.S. (20 How.) 527, 529 (1858)). And "where the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passed—and the voluntariness of waiver destroyed—when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *Id.*

As in *College Savings Bank*, the regulations at issue here have passed "the point of coercion" to induce a waiver of state sovereign immunity. The regulations were adopted with the express purpose of "respon[ding]" to *Seminole Tribe* by eliminating what the Secretary perceived to be an undesirable "State veto over IGRA's dispute resolution system[.]" 64 Fed. Reg. at 17,536. And they have the effect of coercing States into waiving immunity when sued by a tribe under 25 U.S.C. § 2710(d)(7). If a State is sued under that provision and waives its immunity to allow the litigation to proceed, it will be subject to the

imposition of gaming procedures only if the court finds that the State has not negotiated in good faith, and even then, the procedures will be chosen by a court-appointed mediator from one of the proposals submitted by the parties. The Secretary's regulations, by contrast, do not provide those protections. If the regulations were valid, there would be no reason for a State *not* to waive its immunity: a State would be better off litigating under Section 2710(d)(7), with the safeguards that that provision guarantees, than placing itself at the mercy of the Secretary. The regulations are therefore "properly viewed as a means of pressuring the States to accept policy changes"—namely, waiving their sovereign immunity. *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 567 U.S. 519, 580 (2012). Because the purpose and effect of the regulations is to pressure States into surrendering a constitutionally guaranteed prerogative, they are unconstitutional.

3. Finally, if the Court were to reach step two of *Chevron*, the regulations would be invalid because they are not a reasonable interpretation of the statute. At *Chevron* step two, "the question for the court is whether the agency's interpretation is based on a permissible construction of the statute . . . in light of its language, structure, and

purpose." *Am. Fed'n of Labor & Cong. of Indus. Orgs.* v. *Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005) (internal quotation marks omitted). The regulations establish a remedial scheme that differs from that of the statute in several respects, the most significant of which is the abandonment of any requirement that the State be found not to have negotiated in good faith. The regulations undermine, rather than promote, one of the key purposes of IGRA—guaranteeing that gaming will be governed by compacts negotiated between States and tribes. Section 2710(d)(7) is a narrow exception to the regime of freely negotiated compacts, and it is intended as a safeguard to protect tribes against recalcitrant States who negotiate in bad faith. The regulations, which require no finding of bad faith, transform that narrow exception into a mechanism that tribes can use to coerce even cooperative States.

## II.   The Pueblo's severability arguments lack merit

The Pueblo argues (Pet. 10-16) that the panel's decision conflicts with *Alaska Airlines, Inc.* v. *Brock*, 480 U.S. 678 (1987), in which the Supreme Court considered the circumstances in which unconstitutional portions of a statute may be severed from other provisions of a statute, as well as with decisions of the Ninth and Eleventh Circuits that

pre-date the adoption of the Part 291 regulations. That argument lacks merit.

1. In its opening brief (at 24), the Pueblo argued that various provisions of IGRA that were not challenged in *Seminole Tribe* should nevertheless be struck down in light of that decision in order "to allow the Pueblo to proceed with the governance of Class III gaming." Those arguments were misdirected because the State's complaint sought only a declaration that the Part 291 regulations are invalid and an injunction against their application, App. 21, and that is the only relief the district court granted, S.A. 73-74. Although the Pueblo intervened to oppose the relief sought by the State, it did not file its own complaint seeking a declaratory judgment invalidating any part of IGRA.

The panel concluded that the Pueblo was not "limited to litigating the issues raised in the pleadings." Slip op. 50. Although the State respectfully disagrees with that conclusion, there is no need to revisit it at this stage of the proceedings because the Pueblo appears no longer to be seeking a freestanding declaration that parts of IGRA must be struck down. Rather, although it refers to "severability," its argument is that in light of *Seminole Tribe*, the Court should "conclude that a

federal remedy through Secretarial procedures is necessary to preserve Congress's balancing of state and tribal interests in IGRA and to secure the benefits of IGRA to tribes." Pet. 12-13. In other words, the Pueblo's argument is simply another form of its *Chevron* argument: the Pueblo contends that the statute should be construed in such a way as to permit the Secretary to adopt the Part 291 regulations. That argument lacks merit.

2. The premise of the Pueblo's argument (Pet. 11) is that *Seminole Tribe* created a "statutory gap" that the Secretary must fix. But while *Seminole Tribe* altered the way the statute operates in certain cases, it did not alter the statute's unambiguous language. And as the Supreme Court has observed, "unambiguous language" constitutes "a clear sign that Congress did *not* delegate gap-filling authority to an agency." *United States* v. *Home Concrete & Supply, LLC*, 132 S. Ct. 1836, 1843 (2012) (plurality opinion). The *Seminole Tribe* decision is thus no different from any other event that occurs after a statute is enacted and that causes the statute to operate differently than it did at the time of enactment. Such an event might be a reason for Congress to amend the statute, but it is not a basis for either an agency or

- 16 -

the courts to ignore the statute's unambiguous language. As the Supreme Court has explained, "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," but it emphatically "does not include a power to revise clear statutory terms that turn out not to work in practice." *Util. Air Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2446 (2014).

In any event, as the panel recognized, there are many circumstances in which, even after *Seminole Tribe*, the statute's remedial scheme can still work exactly as intended. Most significantly, "the United States may sue on behalf of a tribe in its role as trustee, sidestepping the sovereign immunity defense." Slip op. 57. For that reason, "IGRA remains capable of functioning largely as Congress intended it to." *Id.* The Pueblo asserts (Pet. 12) that a suit by the United States is merely an "unlikely hypothetical remed[y]" and that the panel's decision will "leav[e] tribes without a definite recourse against recalcitrant states as Congress intended." But in the more than 20 years since *Seminole Tribe* was decided, States do not appear to have disregarded their obligations or acted in bad faith, and the Secretary has never

imposed procedures under Part 291. The suggestion that the panel's decision will upset the statutory balance is therefore unfounded.

The Pueblo relies on decisions of the Eleventh and Ninth Circuits, but both of the cited decisions preceded the adoption of the Part 291 regulations. The Eleventh Circuit merely suggested, in dicta, that "[t]he Secretary . . . *may* prescribe regulations governing class III gaming on the tribe's lands." *Seminole Tribe of Fla.* v. *Florida*, 11 F.3d 1016, 1029 (11th Cir. 1994) (emphasis added), *aff'd*, 517 U.S. 44 (1996). The regulations were not promulgated until five years later. The Ninth Circuit was likewise without the benefit of the final regulations and did not interpret the statutory text in any case. *United States* v. *Spokane Tribe of Indians*, 139 F.3d 1297, 1302 (9th Cir. 1998). Neither court was confronted with the regulations that have now been promulgated, and neither court considered a challenge to their validity. To the contrary, as noted above, the only other court of appeals to rule on such a challenge held the regulations to be invalid. *See Texas*, 497 F.3d at 491.

## CONCLUSION

The petition for rehearing and rehearing en banc should be denied.

Respectfully submitted.

                                    *s/ Eric D. Miller*

Jennifer A. MacLean                 Eric D. Miller
JMacLean@perkinscoie.com            EMiller@perkinscoie.com
PERKINS COIE LLP                    PERKINS COIE LLP
700 13th St., N.W., Suite 600       1201 Third Avenue, Suite 4900
Washington, D.C. 20005              Seattle, WA 98101-3099
Telephone: 202.654.6200             Telephone: 206.359.8000


July 10, 2017

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 40(b) because it contains 3602 words. I further certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

*s/ Eric D. Miller*
Eric D. Miller

Dated:    July 10, 2017

## CERTIFICATE OF SERVICE

I certify that on July 10, 2017, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify that all required privacy redactions have been made.

I certify that, within two business days, I will cause to be delivered to the Clerk of the Court seven exact copies in paper form of this electronically filed brief.

I certify that, prior to filing, I have scanned this file using System Center Endpoint Protection updated on July 10, 2017, which indicates that it is free of viruses.

*s/ Eric D. Miller*
Eric D. Miller